**UNITED STATES of America**

v.

**James F. O'CONNOR and James A. Geisler, defendants.**

**No. CRIM. 00–285–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 16, 2001.

Robert Spencer, Dana Boente, U.S. Attorney's Office, Alexandria, VA, for Plaintiff.

C. Dean Latsios, Fairfax, VA, Michael William Lieberman, Alexandria, VA, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ELLIS, District Judge.

This sixty-one count criminal Indictment against two defendants, James F. O'Connor and James A. Geisler, came before the Court for a bench trial. In Counts 1–48 of the Indictment, defendants were jointly charged with (i) conspiracy to commit immigration fraud, tax fraud and wire fraud, in violation of 18 U.S.C. § 371 (Count 1), (ii) immigration fraud, in violation of 18 U.S.C. § 1546(a) (Counts 2–25), (iii) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 26)

and (iv) money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) (Counts 27–48). In addition to these offenses, defendant O'Connor was separately charged in Counts 49–52 with filing false income tax returns, in violation of 26 U.S.C. § 7206(1) (Counts 49–50) and failure to file income tax returns, in violation of 26 U.S.C. § 7203 (Counts 51–52). Defendant Geisler, in turn, was separately charged in Counts 53–61 with filing false income tax returns, in violation of 26 U.S.C. § 7206(1) (Counts 53–55) and bankruptcy fraud, in violation of 18 U.S.C. § 152 (Counts 56–61).

In the course of the eleven-day bench trial, held on March 28–April 18, 2001, the government presented the testimony of thirty-seven witnesses. Included in this number were (i) one Immigration and Naturalization Service (INS) adjudication officer; (ii) one special agent of the INS; (iii) one revenue officer from the Internal Revenue Service (IRS); (iv) two special agents of the IRS; (v) one attorney with the Tax Division of the Department of Justice (DOJ); (vi) one immigration attorney involved in defendants' fraudulent immigration scheme; (vii) three former sales agents of InterBank, a company formed and operated by O'Connor and Geisler; (viii) one Bahamian bank representative involved in defendants' fraudulent immigration scheme; (ix) two accountants hired to perform work for O'Connor and Geisler, both individually and on behalf of InterBank; (x) seven alien investors recruited to participate in defendants' fraudulent immigration scheme; and (xi) one forensic accountant.[1]

---

1. Specifically, the government's thirty seven witnesses were as follows:

 1. William K. Renwick, Jr.—an INS adjudication officer;

2. Mark Siljander—a former member of Congress and former marketing consultant to InterBank;
3. Pranaya Shrestha—an alien investor from Nepal;

O'Connor and Geisler, in turn, jointly presented the testimony of twelve witnesses, including (i) defendant O'Connor;[2] (ii) five former employees of InterBank; (iii) a former Associate General Counsel to the INS; (iv) one immigration attorney; (v) one tax attorney; (vi) one accountant hired to perform work for O'Connor and Geisler, both personally and on behalf of InterBank; and (vii) an accounting expert.[3]

4. Simon Oliver—an alien investor from England;

5. Denise DeOliveira—an alien investor from Brazil;

6. Joanna Miller—the former executive assistant to O'Connor at InterBank;

7. Julio Medina—an employee of First Union National Bank;

8. Hywel Jones—a consultant to a Bahamian bank and a principal to another Bahamian entity, both of which were used by the defendants in furtherance of the fraudulent immigration scheme;

9. David Barber—a former sales agent for InterBank in Virginia;

10. Henri Rochard—an alien investor from France;

11. Carlo Barbieri—an alien investor from Brazil;

12. Robert Young—an individual who rented property to O'Connor and Geisler, on behalf of InterBank, in Highlands County, Florida;

13. Gerson Furtado—the former Vice-President of Latin American Sales for InterBank;

14. Wendy Spaulding—a forensic accountant;

15. David Wong—a former sales agent for InterBank in Virginia;

16. Franco Tamborra—an alien investor from Italy;

17. Richard Hardison—an individual who leased property to O'Connor and Geisler, on behalf of InterBank, in Winchester, Virginia;

18. Frank Ricci—a former immigration attorney affiliated with O'Connor and Geisler in connection with the fraudulent immigration scheme;

19. Alice Tan—an alien investor from Singapore;

20. Patricia Harrington—a Virginia realtor involved in O'Connor's purchase of a home;

21. Mark Morrill—a Virginia loan processor involved in O'Connor's purchase of a home;

22. Eileen Conover—an accountant hired to perform work for O'Connor and Geisler, both individually and on behalf of InterBank;

23. Yukiko Leonard—an individual who leased a home to O'Connor in Virginia;

24. Charles Frank—an IRS revenue officer assigned to collect O'Connor's delinquent taxes;

25. Edwin Michael Barbary—a special agent from the IRS;

26. Charles Burgett—O'Connor's father in law;

27. Michael Martineau—an attorney with the Tax Division of the DOJ;

28. Robert Samson—an accountant hired to perform work for O'Connor and Geisler, both individually and on behalf of InterBank;

29. Martin Turk—the former Vice President of Construction for InterBank;

30. Lisa Ann Mayne—an attorney who represented one of Geisler's personal creditors;

31. Bradshaw Rost—an attorney who represented one of Geisler's personal creditors;

32. Daniel Johnson, Jr.—a senior analyst involved in Geisler's bankruptcy proceeding;

33. William Scott Stephens—a former employee of Edge Development, a company operated by Geisler, who filed a proof of claim in Geisler's bankruptcy proceeding;

34. William Allen—a former business partner of Geisler, who filed a proof of claim in Geisler's bankruptcy proceeding;

35. Richard Durishan—a former business partner of Geisler, who filed a proof of claim in Geisler's bankruptcy proceeding;

36. Robert Warren—a special agent with the IRS; and

37. Elizabeth Goyer—a special agent with the INS.

2. Defendant Geisler did not testify at trial.

3. Specifically, defendants' twelve witnesses were as follows:

1. O'Connor;

2. Lane Bailey—the Chief of Staff to a United States Senator;

Recorded and issued here, pursuant to Rule 23(c), Fed. R.Crim. P., are the facts found specially from the record beyond a reasonable doubt, and the applicable conclusions of law.

## FINDINGS OF FACT

### I. The Defendants and the EB–5 Visa Program

1. Defendant James F. O'Connor is the founder and president of The InterBank Group, Inc. (InterBank), an umbrella company encompassing various other business entities controlled by him and his co-defendant, James A. Geisler, including Atlantic Forex, Market Makers and the Toll Taker Fund. Geisler first joined InterBank as a sales manager in 1990, but, since 1991, has served as a paid consultant. At all times relevant to this matter, O'Connor and Geisler were essentially partners in the business operations of InterBank and its various affiliated companies.

2. In 1994 or 1995, Mark Siljander, a former member of Congress who was then serving as a marketing consultant for InterBank, introduced O'Connor and Geisler to the EB–5 investment visa program, enacted by Congress in 1990. *See* 8 U.S.C. § 1153(b)(5). Under the EB–5 visa program, aliens may obtain lawful permanent resident status in the United States if they invest $500,000 in a new commercial enterprise located in a rural or high-unemployment area of the United States and create at least ten new jobs in the course of doing so. *See id.* To apply for an EB–5 visa, an alien must file an application, namely INS Form I–526, with the appropriate Service Center of the INS, establishing, *inter alia,* that his or her $500,000 investment is fully at risk and that the source of the investment is lawful. In this regard, federal regulations allow aliens to borrow funds to meet the required $500,000 investment, but the existence of any such loan is material and thus must be disclosed in the EB–5 application to enable the INS to determine (i) that the financing meets the regulatory definition of "capital," [4] (ii) that the debt is secured by the assets of the alien, not of the commercial enterprise in which he or she is investing, and (iii) that the alien is personally and primarily liable for the debt. *See* 8 C.F.R. § 204.6(e). Indeed, at trial, William Renwick, an INS adjudication officer, testified convincingly that the existence of any loan obtained and used by an alien in order to reach the

3. Gerson Furtado—the former Vice-President of Latin American Sales for InterBank;

4. Gabriel Joseph—a former consultant to InterBank, hired to find target areas for job creation in connection with defendants' fraudulent immigration scheme;

5. Donald Anderson—the former Director of Marketing for InterBank;

6. Benjamin Teates—the former Vice President of Engineering for InterBank;

7. Wanda Shiflett—the former executive assistant to Geisler at InterBank;

8. Derrick Smith—a former Associate General Counsel to the INS;

9. Dale Schwartz—an immigration attorney hired by the defendants to provide an opinion letter regarding the acceptance of fees by InterBank from alien clients;

10. Robert Jones—a tax attorney;

11. Fathy Abouzied—an accountant, currently suffering from a brain disorder, *see* ¶ 23, n. 27, *supra,* hired to perform work for O'Connor and Geisler, both personally and on behalf of InterBank; and

12. Christina Wright—an accounting expert.

4. The regulations define the term "capital" as "cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by assets owned by the alien entrepreneur, provided that the alien entrepreneur is personally and primarily liable and that the assets of the new commercial enterprise upon which the petition is based are not used to secure any of the indebtedness." 8 C.F.R. § 204.6(e).

requisite $500,000 investment amount is material and must be disclosed to the INS on Part 4 of Form I–526.

3. O'Connor and Geisler jointly devised a scheme and plan to induce aliens who wished to receive the benefits of the EB–5 program, but who did not possess the requisite $500,000 investment, to invest some lesser amount of money, typically between $100,000 to $150,000, with a purported EB–5 program operated by O'Connor and Geisler through InterBank. Thus, in 1996, O'Connor and Geisler, through InterBank, began marketing and selling the EB–5 visa program to alien investors under the name "Invest in America." One way in which InterBank accomplished this task was through the use of affiliated immigration attorneys, including Frank Ricci, who, after discussions with O'Connor and Geisler, marketed and sold the EB–5 program to various alien clients throughout the world.[5] Typically, InterBank paid these affiliated immigration attorneys a fee, usually between $4,000 and $20,000, for each alien investor recruited to participate in Inter-Bank's EB–5 visa program. In addition to using immigration attorneys, InterBank sales staff, including David Barber, David Wong and Gerson Furtado,[6] also sold the Invest in America program to prospective alien clients directly, using newspaper advertisements, both foreign and domestic, live presentations, and telephone conversa-

tions. In this regard, O'Connor and Geisler explained the EB–5 visa program to the InterBank sales staff, created the marketing materials used to promote Inter-Bank's "Invest in America" program, and directed the sales staff regarding the manner in which the program was to be marketed and sold. InterBank employees were typically paid a $4,000 commission for each alien investor recruited into the EB–5 visa program.

4. In selling the Invest in America program, both the affiliated immigration attorneys and the InterBank sales staff, at the direction of O'Connor and Geisler, advised prospective alien clients that the total required investment was $500,000, but that the alien need only contribute between $100,000 and $150,000, plus a processing fee of approximately $20,000.[7] The aliens were further advised that the balance of the requisite $500,000 would be funded by a loan obtained by InterBank from a Bahamian bank on behalf of the alien client. As to this particular aspect of the investment, alien investors were told (i) that the loan was to be a non-recourse, non collateral loan, secured by the assets of InterBank and its affiliates, not the assets of the particular alien client, (ii) that the loan would be repaid by InterBank and its affiliates, and (iii) that the particular alien was not required to pay the loans or put up any collateral for the loan.[8] De-

---

**5.** Ricci, in particular, marketed and sold the Invest in America program in the United States, Canada, the Philippines, Taiwan, Hong Kong, Indonesia, Dubai, Bahrain, India, Jordan, the Dominican Republic, Mexico, Colombia and Venezuela.

**6.** Barber and Wong were employed as Inter-Bank sales agents in Virginia, while Furtado served as InterBank's Vice President of Sales for Latin America.

**7.** For example, Pranaya Shrestha was told he need only provide InterBank with a $20,000 administrative fee, plus a $135,000 invest-

ment, which amount was later reduced by InterBank to $100,000. Simon Oliver, Denise DeOliveira, Carlo Barbieri, Franco Tamborra and Alice Tan were likewise advised that they needed to provide only a $100,000 investment, plus an administrative fee. Other alien clients, including Henri Rochard, were told that they needed to provide a $150,000 investment, plus the administrative fee.

**8.** For example, Oliver was told that the majority of his $500,000 investment would be funded by a Bahamian loan. DeOliveira and Barbieri were also advised that a loan would be used to reach the requisite $500,000

spite these representations to alien clients, the trial record, including the testimony of Ricci, Furtado, Wong and Barber, establishes that neither the sales staff nor the affiliated attorneys marketing the Invest in America program to alien investors ever actually saw any loan documents.[9]

5. Affiliated immigration attorneys and InterBank sales staff, again at the direction of O'Connor and Geisler, also promised alien clients that any funds contributed by the alien to the Invest in America program would be held in escrow until their EB–5 application was approved by the INS.[10] The promises and representations concerning the escrow account, together with the representations concerning the non-recourse, non-collateral nature of the loans, were important and material to the alien clients and induced at least 200 alien clients to enroll in the Invest in America program, thereby providing InterBank, often by wire, with up to $150,000 in investment funds, plus a $20,000 processing fee. In all, InterBank took in approximately 21 million dollars from its alien client investors during the life of the program.

6. In 1996, the first year of the Invest in America program, InterBank filed five EB–5 petitions with the INS on behalf of alien clients. A portion of the requisite $500,000 investment for each of these petitions was comprised of a promissory note signed by the alien and, at the direction of O'Connor and Geisler, this fact was disclosed to the INS in the five petitions. Late that year, however, O'Connor and Geisler learned that the use of promissory notes in connection with the EB–5 program was drawing strict INS scrutiny and thus, they began searching for alternative means of financing using an overseas bank.

7. In early 1997, James Schmidt, a Florida businessman and attorney, introduced O'Connor and Geisler to Hywel Jones, a consultant to the Canadian Imperial Bank of Commerce (CIBC), located in the Bahamas.[11] Jones also served as a principal to another Bahamian entity affiliated with CIBC, namely Britannia Assurance Internationale (BAI). After discussions with Jones, O'Connor, with the knowledge and cooperation of Geisler, devised a sham loan transaction, involving Jones, CIBC and BAI, to be used in connection with all future EB–5 applications filed by InterBank on behalf of alien clients.

8. To implement the scheme, InterBank, at the direction of O'Connor and Geisler, first opened a "For the Benefit of" (FBO) account at First Union National Bank (FUNB) in Virginia on behalf of a particular alien client, depositing therein

---

9. amount, and that they would not be personally liable on such loan. Rochard and Tamborra were likewise told that their "loans" would be funded by something other than their own assets and that they would not be responsible for repayment of such loans.

9. Defendants kept a purported "loan book" in connection with the Invest in America program, containing the names of 187 alien clients. Of these 187 clients, only 11 appear to have signed any loan documents. For the remaining alien clients listed in the "loan book," either no loan documents were prepared, or loan documents were prepared, but not signed.

10. This fact was confirmed by the trial testimony of Shrestha, Oliver, DeOliveira, Rochard, Barbieri, Tamborra and Tan, each of whom stated they would not have provided any money to InterBank without the promise of the escrow agreement.

11. This introduction was prompted by O'Connor's offer of $5,000 to Schmidt if he could quickly introduce InterBank to an offshore bank willing to make loans to InterBank clients in connection with the Invest in America program.

the alien's original $100,000 to $150,000 investment in the EB–5 program. Approximately 24 hours after a particular FBO account had been opened, InterBank, again at the direction of O'Connor and Geisler, wired money, usually between $350,000 and $400,000, from a Virginia account controlled by O'Connor and Geisler, to an account controlled by Jones in the Bahamas. Jones was then instructed, by facsimile sent from InterBank, to wire the money back to a specific FBO account at FUNB in Virginia, raising the total amount of funds in the particular FBO account, at least for that specific moment, to $500,000. In each instance, either O'Connor or Geisler directed, verified and approved the wire transfers to and from the Bahamas. Many of the banking and wiring acts undertaken by InterBank in furtherance of the scheme were performed by O'Connor's executive assistant, Joanna Miller, at the direction of O'Connor and Geisler.

9. Once Jones had wired the specified funds back to a specific FBO account in Virginia, as instructed, Miller, at the direction of O'Connor and Geisler, ordered a print screen from FUNB which, in all cases, reflected an account balance of $500,000 in the particular FBO account. The purpose of the print screen, which was typically sent to InterBank by facsimile, was to serve as false proof to the INS that a particular alien client had invested the requisite $500,000 in the EB–5 visa program, when, in fact, no such amount had been invested. The false nature of the print screens was confirmed at trial by Robert Samson, an accountant hired by O'Connor and Geisler to "clean up" Inter-Bank's financial records,[12] who testified that "there was no money truly invested in the bank accounts." Promptly after Inter-Bank received each print screen, O'Connor and Geisler directed that the $500,000 in that particular account be removed and re-deposited into a general InterBank or Invest in America account under their control. These funds were then used, again and again, to effect similar sham loan transactions in connection with other alien investors.

10. Typically, only one to two days were required to complete the entire transaction, consisting of (i) wiring money from InterBank to the Bahamas and then back to a particular FBO account in Virginia, (ii) ordering and receiving a print screen reflecting a $500,000 balance in the particular FBO account and (iii) removing the funds from the FBO account and re-depositing them into a general account controlled by O'Connor and Geisler. This circular transaction[13] was completed, per the instructions of O'Connor and Geisler, 163 times, and the total amount of funds that passed through Jones' control in the Bahamas was approximately 80 million dollars. As confirmed by the government's forensic accountant, Wendy Spaulding, all of this amount originated from InterBank[14] and, in fact, most of it was

12. Samson never performed an audit or verified the figures he received from O'Connor and Geisler.

13. O'Connor and Geisler referred to the circular transaction as the "circle of life," meaning the same money was circled to and from the Bahamas in order to keep the Invest in America program alive and running.

14. Indeed, at trial, O'Connor admitted that Jones, through CIBC or BAI, never made a "loan" to an alien client where InterBank did not first wire sufficient funds to the Bahamas. Nonetheless, he testified that BAI made loans "based on its own resources" and insisted that the money InterBank wired to the Bahamas and the money wired back to Virginia by BAI was "not the same money." This testimony is simply illogical and unpersuasive and was convincingly contradicted by the trial record, including the testimony of the government's forensic accountant.

recycled, the same funds making the journey to and from the Bahamas again and again, as InterBank took in only approximately 21 million dollars from alien investors throughout the entire period the Invest in America program was marketed and sold.

11. For some of these circular money transactions, Jones, through Beaumont International Insurance Ltd. (Beaumont), issued an annuity on behalf of a particular alien client. Indeed, during the time he was involved in the fraudulent immigration scheme, Jones issued 72 annuities, at the direction of O'Connor and Geisler, each of which consisted of a piece of paper naming the annuitant as the alien client and the contract holder as Market Makers, L.L.C., another corporation formed and controlled by O'Connor and Geisler. Jones signed each annuity, but none was ever signed on behalf of Market Makers. In this regard, Samson testified at trial that the lack of Market Makers' signature on the annuities rendered each annuity invalid and worthless. He further testified that even if Market Makers had signed the annuities, they would still be worthless given that InterBank, through O'Connor and Geisler, agreed to hold Beaumont harmless on such annuities.

12. After they had created false evidence, through the use of the sham loan transactions and misleading print screens, that each alien client had invested the requisite $500,000 into the EB–5 program, O'Connor and Geisler next devised a scheme to create false evidence that such investment had generated, or would generate within two years, at least ten new

American jobs. Thus, at some point in the scheme, O'Connor and Geisler directed that certain InterBank employees be paid, at least on the business records, by Market Makers. In furtherance of the scheme, from January 1996 until August or September 1998, Market Makers leased a small office in Winchester, Virginia from Richard Hardison, on the second floor of a trucking terminal. Also, in April 1997, InterBank leased a small office in Avon Park, Highlands County, Florida from Robert Young. O'Connor and Geisler intended both of these sites to serve as phantom operational centers of Market Maker's purported new commercial enterprise, a telemarketing business in which the alien clients were allegedly investing their funds for the purpose of creating ten American jobs. Indeed, InterBank, through O'Connor and Geisler, falsely represented to the INS in the EB–5 applications that each alien client had invested the requisite $500,000 in Market Maker's new telemarketing business. The INS was further falsely advised that this new telemarketing business was to have multiple employee operational centers in both Winchester, Virginia[15] and Highlands County, Florida.[16] In fact, however, just one employee-an InterBank employee-worked at the Winchester location, and one employee—Geisler's brother-worked at the Highlands County location. Geisler's brother, in particular, was hired to answer the telephone at the Highlands County office and was supplied by O'Connor and Geisler with a script to be used when doing so, in order to make it appear that there was an operating and well-

---

15. Thirty EB–5 petitions filed by InterBank on behalf of alien clients at the Vermont Service Center list Winchester, Virginia as the location where the new commercial enterprise was to be located and 179 other petitions list West Virginia as the proposed business location.

16. All 127 InterBank petitions filed with the INS Texas Service Center list Highlands County, Florida as the location where the new commercial enterprise was to be located.

staffed business at the Highlands County office when, in fact, there was not. One particular false statement to the INS in this regard occurred on April 15, 1997, when O'Connor, with Geisler's knowledge and cooperation, wrote to the INS Vermont Service Center falsely representing that five InterBank employees worked full-time for Market Makers in Winchester, Virginia. Attached to this letter were the W–4 forms for these five InterBank employees, which were included by O'Connor and Geisler in order to create the false impression that these employees worked for Market Makers in Winchester, Virginia when, in fact, they did not.

13. During the life of the Invest in America program, InterBank filed EB–5 applications at the INS Texas Service Center and/or the INS Vermont Service Center on behalf of numerous alien clients, including Denise DeOliveira (Count 2), Mathilde Dardi (Counts 3 and 4), Carlo Barbieri (Counts 5 and 6), Kruparao Kancharla (Counts 7 and 8), Elizabeth Conway (Counts 9 and 10), Marie–Helene Ndama (Counts 11 and 12), Roger Matteau (Counts 13 and 14), Steven Matteau (Count 15), Franco Tamborra (Counts 16 and 17), Chee Seng Tan (Counts 18 and 19), Simon Oliver (Counts 20 and 21), Henri Rochard (Count 22), Bishnu Shrestha (Count 23), Megha Shrestha (Count 24) and Archana Shrestha (Count 25). In each of these EB–5 applications, InterBank, at the direction of O'Connor and Geisler, falsely represented that the particular alien client had invested the requisite $500,000 investment in a new commercial enterprise, namely Market Makers. InterBank also sent accompanying letters and purported evidence, including the fraudulent FUNB print screens, supporting each alleged $500,000 investment. In fact, most of these clients invested only between $100,000 and $150,000 in the Invest in America program. Other clients, including Kancharla, invested only $50,000, and still others, including Ndama and Steven Matteau, invested nothing at all.

14. The specific wire transfers directed, verified and approved by O'Connor and Geisler, as to each of the alien clients referenced in Counts 2–25 of the Indictment, are the subjects of Counts 27–48 and are summarized in the following chart: [17]

| Count | Date of wire | From | To | Amount wired | Alien(s) |
|---|---|---|---|---|---|
| 27 | 8/20/97 | FUNB | CIBC | $1,508,000 | DeOliveira, et al.[18] |
| 28 | 8/20/97 | CIBC | FUNB | $ 400,000 | DeOliveira |
| 29 | 8/13/97 | FUNB | CIBC | $ 402,000 | Dardi |
| 30 | 8/13/97 | CIBC | FUNB | $ 400,000 | Dardi |
| 31 | 9/15/97 | FUNB | CIBC | $ 402,000 | Barbieri |
| 32 | 9/16/97 | CIBC | FUNB | $ 400,000 | Barbieri |
| 33 | 8/18/97 | FUNB | CIBC | $1,608,000 | Kancharla, et al. |
| 34 | 8/18/97 | CIBC | FUNB | $ 400,000 | Kancharla |
| 35 | 4/8/98 | FUNB | CIBC | $1,155,750 | Conway, et al. |
| 36 | 4/8/98 | CIBC | FUNB | $ 400,000 | Conway |

17. Each of these wire transfers likewise constitutes a separate count of the Indictment.

18. In some instances, O'Connor and Geisler directed larger wire transfers on behalf of several alien clients at once. Included in this chart are several of these "group" wire transfers, with only the particular alien clients involved in the charged offenses identified specifically. The "et al." reference included in some of the chart entries represents the remaining alien clients involved in these group wire transfers.

| 37 | 9/11/97 | FUNB | CIBC | $1,156,000 | Ndama, et al. |
| 38 | 9/11/97 | CIBC | FUNB | $ 350,000 | Ndama |
| 39 | 12/3/97 | FUNB | CIBC | $1,557,750 | Matteau, et al. |
| 40 | 12/4/97 | CIBC | FUNB | $ 400,000 | Matteau |
| 41 | 10/21/97 | FUNB | CIBC | $1,859,250 | Tamborra, et al. |
| 42 | 10/21/97 | CIBC | FUNB | $ 400,000 | Tamborra |
| 43 | 10/29/97 | FUNB | CIBC | $1,206,000 | Tan, et al. |
| 44 | 10/30/97 | CIBC | FUNB | $ 400,000 | Tan |
| 45 | 12/10/97 | FUNB | CIBC | $1,959,750 | Oliver, et al. |
| 46 | 12/10/97 | CIBC | FUNB | $ 400,000 | Oliver |
| 47 | 1/21/98 | FUNB | CIBC | $ 753,750 | Rochard, et al. |
| 48 | 1/21/98 | CIBC | FUNB | $ 350,000 | Rochard |

15. In all, from 1996 to 2000, Inter-Bank filed with the INS, under oath, approximately 335 EB-5 visa applications on behalf of alien clients,[19] each of which was prepared at the direction of O'Connor and Geisler. Each petition stated falsely that the particular alien client had invested $500,000 in a new commercial enterprise, as required by the EB–5 program, and that each investment had created, or would create within two years, ten new American jobs. In fact, not a single alien client invested the requisite $500,000 in a new commercial enterprise. Each petition also failed to disclose that the bulk of the alien's alleged $500,000 investment was comprised of a sham Bahamian loan. All of this information-that is, the existence of the sham Bahamian loan and the fact that each alien client had failed to invest $500,000 in the EB–5 program or create ten new jobs—was material to the INS, as confirmed by Renwick's trial testimony.

16. O'Connor and Geisler purposefully concealed the use of any loans in the EB–5 applications and accompanying materials and likewise, purposefully failed to disclose the loans or the source of the alleged $500,000 investment in subsequent letters sent to the INS in response to requests for additional information. Indeed, at some point, O'Connor advised the InterBank sales staff and one immigration attorney, Frank Ricci, that "we are not going to let the INS know that there is a loan." Likewise, Geisler told Ricci that revealing the fact of a loan would be "waving a red flag."

17. InterBank, at the direction of O'Connor and Geisler, also improperly filed separate EB–5 applications on behalf of 93 alien investors with two INS Service Centers—in this case, the Vermont Service Center and the Texas Service Center—basing such double-filed petitions on the same purported $500,000 investment. Of these double-filed applications, InterBank routinely filed one that included a forged signature of the particular alien investor. The trial testimony of alien clients Shrestha, Oliver, Barbieri, Tamborra and Tan confirmed this fact, and each testified that they did not give InterBank authorization to forge their signatures on any of the documents submitted to the INS. Both

19. On some occasions, InterBank personnel, at the direction of O'Connor and Geisler, filled out the substantive portion of an EB–5 application, falsely representing that the alien client had invested $500,000, and then had the alien investor sign the completed form. On other occasions, InterBank directed the alien investors to sign blank or partially blank applications, which were later completed by InterBank personnel, at the direction of O'Connor and Geisler, to reflect falsely that the alien client had invested the requisite $500,000.

O'Connor and Geisler were warned by Ricci that it was improper to file separate EB–5 petitions with two INS Service Centers based on the same purported $500,000 investment. Geisler, in particular, dismissed such warnings, stating to Ricci that "the INS is very disorganized, and they have no way of cross-referencing it."

18. As an inducement to aliens to invest in the Invest in America scheme, InterBank personnel and affiliated attorneys, at the direction of O'Connor and Geisler, represented to the alien clients that their funds would be held in escrow pending INS approval of their EB–5 applications. This representation was false; InterBank did not hold alien investors' funds in escrow pending INS approval of their EB–5 applications, as promised. Instead, shortly after InterBank received a particular alien investor's funds, such funds were commingled with other funds controlled by O'Connor and Geisler and subsequently used by O'Connor and Geisler to fund the sham Bahamian loan transactions and various other InterBank operations, and for personal uses. O'Connor admitted at trial that the escrow promise made to the alien clients was a misrepresentation and that "we deceived our clients by not doing what we said we were going to do." Geisler also admitted to one alien client, Simon Oliver, that "it was illegal" to delve into the escrow funds, but that InterBank needed the funds to keep the Invest in America program alive.

19. Throughout the life of the Invest in America program, many alien investors understandably became concerned about the status and legitimacy of their investment. Many requested that InterBank return their money and, in this regard, most spoke to O'Connor and Geisler directly.[20] Despite these repeated requests, O'Connor and Geisler did not return the majority of the alien investors' funds, as most of these funds had been commingled with other funds and had since been depleted by O'Connor and Geisler for a variety of purposes, including personal uses. Of the few alien clients who did ultimately receive their money back, most were able to do so only because they had elected to place their investment into a trust held by their own immigration attorney, rather than entrusting their money to InterBank. One alien client, Tan, received her money back only because she threatened to report O'Connor and Geisler to the Federal Bureau of Investigation (FBI) and appeared with an attorney at InterBank's offices to confront O'Connor and Geisler.

20. Neither O'Connor nor Geisler ever sought or received professional advice or a legal opinion, oral or written, regarding the legitimacy of the Invest in America program or the Bahamian loan scheme. In this regard, although O'Connor and Geisler contend that they received a legal opinion from Attorney James Schmidt, identified *supra* ¶ 7, the evidence simply does not support this contention. To the contrary, the trial record reflects that Schmidt provided only CIBC with an opinion letter regarding certain limited aspects of the Bahamian loan scheme, in response to various concerns CIBC had about the "in and out nature" of the loan transactions.[21] This opinion letter, requested by

---

**20.** This fact was confirmed by the credible trial testimony of alien clients Shrestha, Oliver, DeOliveira, Rochard, Barbieri, Tamborra and Tan.

**21.** This fact is supported by Jones' testimony at trial that CIBC was concerned about money laundering. It is further supported by

internal CIBC correspondence, including a February 18, 1997 memorandum from Gil Cassar of CIBC to Jones, which provides, *inter alia,* that "[w]e will wish to have counsel's opinion on the effectiveness of the Pre–Immigration Programme which will incorporate the need for an offshore bank or trust

CIBC and dated March 7, 1997, was addressed solely to Hywel Jones and expressly stated that "[s]aid opinion letter is issued exclusively for the benefit of the addressee." The opinion letter in no way addressed the legality of the overall Bahamian loan scheme or, as O'Connor and Geisler contend, contained an opinion that the Bahamian money transactions created bona fide loans that satisfied INS regulations.[22] Moreover, the substance of the opinion letter makes clear that O'Connor and Geisler did not make full disclosure to Schmidt regarding the Bahamian loan scheme.[23] Additionally, there is no evidence in the record that either O'Connor or Geisler ever received or possessed a copy of the Schmidt letter or that they acted in reliance on Schmidt's professional legal advice. To the contrary, the record establishes that O'Connor and Geisler paid Schmidt not to provide legal advice, but rather simply to introduce them to an off-shore bank willing to participate in the Invest in America scheme. And, to be sure, Schmidt's grand jury testimony establishes conclusively that he did not render a legal opinion to either O'Connor or Geisler in connection with the Invest in America program or the Bahamian loan scheme.[24]

21. The record also convincingly reflects that O'Connor and Geisler were not forthright with the professionals with whom they dealt, but rather withheld information from them. Indeed, on several occasions throughout the course of the Invest in America scheme, accountant Samson asked O'Connor and Geisler for copies of various financial records, loan documents, escrow agreements and partnership documents, but was never provided with such requested information. Additionally, Dale Schwartz, an immigration attorney who filed a number of EB–5 petitions on

company to facilitate the loan payments to the individual foreign nationals applying for U.S. Resident status."

22. Indeed, the letter contains no reference whatsoever to INS regulations, including the requirement that the alien investors' funds be fully at risk, or the requirement that the funds not be secured by assets of the commercial enterprise in which the alien is investing.

23. For example, the opinion letter contains three references to full-recourse loans. The testimony at trial, however, establishes that the alien investors were told the loans would be non-recourse loans. The opinion letter also refers several times to "promissory notes," despite the fact that no promissory notes were involved in the Bahamian loan scheme. Schmidt also indicated in the opinion letter that the loans were "originated and facilitated by major offshore (non U.S.) banks for privacy reasons," which statement contradicts O'Connor's trial testimony that an off-shore bank was used to avoid tax problems. Moreover, as indicated previously, *supra* ¶ 10, the "loans" did not originate with the off-shore bank, but rather, originated from InterBank funds. Finally, the letter re-

flects that Schmidt was unaware of the nature and substance of the representations made by O'Connor and Geisler, or those acting at their direction, to the INS and the alien clients regarding the Invest in America program or the Bahamian loan scheme.

24. Schmidt's grand jury testimony was admitted at trial pursuant to *United States v. McHan*, 101 F.3d 1027, 1037 (4th Cir.1996), as Schmidt was unavailable (not found in the United States) and his grand jury testimony bore sufficient indicia of reliability. The relevant portion of Schmidt's grand jury testimony is as follows:

Q: Did you ever issue a legal opinion to *these guys [O'Connor and Geisler]* about whether their immigration program met the requirements of the U.S. INS?
A. No. We had correspondence back and forth, but I'm not an immigration attorney. . . .
Q: You never gave O'Connor or Geisler or InterBank an opinion that they met the requirements—
A. No. No, no, because, again, I'm not an immigration specialist.
Schmidt grand jury testimony at 23–25.

behalf of InterBank alien clients during the life of the Invest in America program, also was not provided with complete disclosure regarding the details of, and the source of the money for, the Bahamian loan scheme.[25]

## II. False Tax Returns and Failure to File Tax Returns

### A. O'Connor

22. Records from the Internal Revenue Service (IRS) reflect that for tax year 1979, O'Connor owed approximately $186,190 in taxes, interest and penalties, which amount he failed to pay in a timely manner. O'Connor's disregard of filing obligations continued in later years, as well, as he did not file his 1989–1991 tax returns until 1993.

23. The record reflects that O'Connor knowingly filed, under oath, a 1993 income tax return reporting a false business income of $39,965. That year, as he did in all cases, O'Connor actually prepared the tax return himself, with Geisler's knowledge and cooperation, and then directed his accountant, Fathy Abouzied,[26] to sign and file the return on his behalf.[27] Contrary to the amount listed in his 1993 return, O'Connor's true income for tax

year 1993 was $104,045. This amount was comprised of various checks issued by InterBank, all signed by O'Connor, including (i) checks issued to O'Connor on a bi-weekly basis, (ii) checks issued to O'Connor for various personal expenses, (iii) checks issued to his wife, Ann O'Connor, but endorsed and used by O'Connor, and (iv) additional checks issued to O'Connor on an irregular basis. InterBank, on its books, initially recorded all of these checks as executive compensation. Indeed, on an InterBank financial report dated July 5, 1994, O'Connor's 1993 executive compensation was listed as $131,103. In order to conceal O'Connor's true income from the IRS, however, O'Connor and Geisler later directed their accountant, Abouzied, to amend InterBank's financial records to reflect a false, reduced amount of income for O'Connor in 1993. In accordance with these instructions, either Abouzied or his associate, Eileen Conover,[28] subsequently reduced O'Connor's recorded 1993 income to $69,465, as reflected on an InterBank financial report dated July 8, 1994, and then again, to $39,965, as reflected on a subsequent report dated August 8, 1994.

24. Conover testified at trial that she and Abouzied routinely made income ad-

25. O'Connor and Geisler originally hired Schwartz to provide an opinion letter regarding the acceptance of fees by InterBank from alien clients, which Schwartz later did. Thereafter, he assisted O'Connor and Geisler in the preparation of approximately 100 EB–5 petitions on behalf of alien clients. Schwartz never provided either O'Connor or Geisler with a legal opinion as to the legitimacy or legality of the Bahamian loan scheme. At trial, he testified that based on the limited amount of information provided to him by O'Connor and Geisler, he believed the Bahamian loans were legitimate loans, backed by the personal assets of the alien clients. This, as indicated above, was not the case.

26. Fathy Abouzied is a certified public accountant and the owner and manager of Modern Accounting Services and MAS–TAX.

During the relevant time period, he performed accounting services for both O'Connor and Geisler, individually and on behalf of InterBank.

27. This fact is supported by the record evidence, including a July 13, 1995 correspondence from O'Connor to Geisler providing, in part, that "[w]e need to complete the tax returns by Wednesday for the meeting with Fathy [Abouzied]."

28. At trial, Abouzied was unable to testify coherently or recall the relevant events, as he currently suffers from a brain disorder, possibly Alzheimer's Disease. Conover, however, testified credibly and convincingly as to the work she and Abouzied performed in connection with this case.

justments of this sort to InterBank records, always at the direction of O'Connor and Geisler.[29] Indeed, the record evidence establishes that Abouzied and Conover altered the books and records of InterBank, and the personal tax returns of O'Connor and Geisler, only upon the request of, and to the satisfaction of, O'Connor and Geisler. Significantly, neither Abouzied nor Conover ever verified InterBank's financial records, followed proper auditing procedures in performing accounting work on behalf of O'Connor and Geisler or provided independent accounting or income tax advice to O'Connor and Geisler. Rather, they simply accepted the numbers and financial records provided to them by O'Connor and Geisler, and then made changes to those numbers and records as instructed to do so by O'Connor and Geisler. In this regard, Abouzied, at the direction of O'Connor and Geisler, kept two separate sets of financial records for Inter-Bank—one showing a significant profit and one showing a much smaller profit.

25. In 1995, O'Connor knowingly filed, under oath, a 1994 tax return which reported a false business income of $34,951. That year, however, O'Connor had an actual income of $277,250,[30] consisting, again, of (i) bi-weekly salary payments from InterBank of $3,000, (ii) additional checks issued to O'Connor for personal expenses, and (iii) a $145,000 check issued to Ann O'Connor from Atlantic Forex, another company owned and controlled by O'Connor and Geisler.[31] This $145,000 check was used to make a down payment on a home purchased by O'Connor in February 1993.[32]

26. In 1995, the IRS contacted O'Connor in an attempt to collect the $186,190 in back taxes owed for tax year 1979. Thereafter, on March 15, 1995, O'Connor, in response to IRS inquiries, provided, under oath, a Collection Information Statement

---

**29.** She further testified that she often objected to such adjustments as being improper, but that Abouzied overruled her objections and insisted that the adjustments be made.

**30.** This amount is supported by the trial record, including evidence that O'Connor executed an employment contract with InterBank and Atlantic Forex, signed by him and Geisler, providing for a 1994 annual compensation of $75,000, payable in bi-weekly installments, plus a share of dividends from both companies.

**31.** In actuality, Atlantic Forex was a nominee or shell company used by O'Connor and Geisler to conceal their personal income. Indeed, Atlantic Forex did not have a financial identity independent from InterBank and any funds present in the Atlantic Forex account were actually transfers from an InterBank account. As confirmed by the trial testimony of Joanna Miller, the Atlantic Forex account was used solely to issue payments to O'Connor and Geisler or to other individuals on their behalf.

**32.** O'Connor and his wife purchased the home for $565,000 in February of 1993, but requested that the settlement be delayed one year owing to O'Connor's problems with the IRS. In his mortgage application, O'Connor advised the lending institution, Waterfield Financial, that he earned $11,050 a month from InterBank. He and Geisler further directed Abouzied to write a letter to Waterfield Financial supporting O'Connor's reported income of $11,050 per month, which Abouzied did. In May 1994, just before the scheduled closing date, O'Connor obtained the $145,000 down payment for his home from another InterBank affiliate in his control, the Toll Taker Fund. In this regard, to obtain the down payment, on May 25, 1994, O'Connor wrote a $174,900 check from the Toll Taker Fund to Atlantic Forex. That same day, O'Connor wrote a $145,000 check from Atlantic Forex to his wife, who, in connection with the house purchase, then wrote a settlement check to the settlement agent in the amount of $140,795. O'Connor indicated on his mortgage application that no part of the down payment was borrowed. Ultimately, the purchase of the home resulted in a $380,000 mortgage, with a monthly mortgage payment of $3,253.

to IRS Officer Charles Frank, which falsely reported that O'Connor received $2,500 per month from InterBank. In fact, O'Connor received bi-weekly checks from InterBank of between $2,500 and $3,000 in 1995. The Collection Information Statement also falsely reported that O'Connor's monthly expenses were $1,620. Yet, his 1995 monthly mortgage payment alone was $3,253.

27. On March 17, 1995, following receipt of O'Connor's false Collection Information Statement, IRS Officer Frank served a notice of levy on InterBank for any wages, salary or other income owed by InterBank to O'Connor. Two weeks later, on March 31, 1995, InterBank, at O'Connor's direction, began issuing O'Connor's bi-weekly pay checks to his wife, Ann O'Connor, in an effort to conceal O'Connor's true income from the IRS. Specifically, although she did not work at InterBank, Ann O'Connor began receiving bi-weekly checks in the amount of $4,153.85, an amount greater than the amount O'Connor was receiving from InterBank prior to the notice of levy. O'Connor later endorsed and used these checks for his own personal expenses.

28. On April 18, 1995, O'Connor and Geisler jointly authored a letter responding to the IRS notice of levy, which stated falsely that O'Connor's yearly salary from InterBank was $21,752. This letter was purportedly signed by Geisler, but was located on O'Connor's computer directory.

29. By the end of 1995, O'Connor had amassed a total income of $121,377, consisting of regular and periodic checks issued to both him and his wife. Thereafter, he failed to file timely 1995 and 1996 tax returns, although he knew full well he was required to do so.[33] Put another way, O'Connor acted knowingly and willfully in failing to file his 1995 and 1996 tax returns by the filing deadline. Two weeks after the 1995 filing deadline, in particular, O'Connor directed Abouzied to "hold off" on filing the 1995 tax return, knowing that the filing of such return would alert the IRS as to his ability to pay the entire amount of his delinquent 1979 tax liability, which was, at that time, being negotiated with the IRS. O'Connor likewise "held off" on filing his 1996 tax return, instead placing the completed return in InterBank's files, where it remained until Samson discovered it in the course of a routine record check in early 1998.

30. In April 1996, O'Connor directed his accountants, Abouzied and Conover, to change his 1992, 1993 and 1994 tax returns to reflect falsely that he had no ownership interest in InterBank. Then, on May 2, 1996, O'Connor filed, under oath, a financial statement with the Department of Justice (DOJ) which falsely represented that he had transacted no business with any financial institution in the previous three years. He also falsely stated in the financial statement that his yearly housing expenses for 1995 were $9,600, when, in fact, his monthly mortgage payment alone was $3,253. All of these actions were taken in light of an anticipated settlement agreement between O'Connor and the IRS regarding the back taxes owed for tax year 1979. Essentially, O'Connor was attempting to conceal from the IRS his true assets and ability to pay the total amount of back taxes and, in this regard, his plan initially succeeded. Indeed, based in part on the numerous false financial statements made by O'Connor to the IRS and the DOJ in 1995 and 1996 (with Geisler's knowledge

---

33. O'Connor's knowledge of the filing requirements is supported by the trial record, including the fact that he requested and received 4-month filing extensions for both years.

and cooperation), O'Connor's 1979 back tax obligation of over $180,000 was eventually settled for a mere $35,000.

31. In August 1998, O'Connor learned that he was the subject of the instant criminal investigation. Prompted by this fact, two months later, on October 20, 1998, O'Connor filed his delinquent 1995 and 1996 tax returns, both of which contained false information. Specifically, in the 1995 return, he knowingly and falsely reported wages of $11,500 and business income of $24,500, despite the fact that his correct income in 1995 was $121,377. Similarly, in the 1996 return, O'Connor knowingly and falsely reported wages of $13,000 and miscellaneous income of $18,351. In fact, O'Connor received payments from InterBank and Atlantic Forex in 1996 in the amount of $128,502. Most of this amount consisted of biweekly checks in the amount of $4,153.85 issued by Atlantic Forex to Ann O'Connor, each of which was signed by O'Connor and the majority of which were later endorsed and used by O'Connor for personal expenses.

## B. Geisler

32. Like O'Connor, Geisler, too, had a history of failing to pay taxes to the IRS in a timely manner. Indeed, IRS records indicate that Geisler owed $80,555 in back taxes for tax years 1988, 1989 and 1993. Additionally, Geisler, like O'Connor, also filed, under oath, false tax returns, including a false 1994 tax return. Specifically, in the 1994 return, Geisler reported business income of $26,238 and wages of $1,541 when, in fact his actual income in 1994 was

$68,200.[34] This amount was comprised of bi-weekly checks from InterBank, deposited into one of two accounts controlled by Geisler, namely (i) an account in the name of Cast, Inc., on which Geisler was the sole signatory or (ii) a Uniform Gift to Minors (UGM) account in his son's name, Robert E. Geisler.

33. The following year, Geisler filed, under oath, a 1995 income tax return reporting wages of $9,013 and business income of $5,571. His true 1995 income, however, was $108,446,[35] consisting, again, of biweekly checks from InterBank in amounts ranging from $1,615 to $2,500, deposited into either the Cast, Inc., account or the Robert E. Geisler UGM account.

34. On July 21, 1995, InterBank was served with a garnishment summons for Geisler's wages based on a previous debt owed by Geisler to a construction company, the Roof Center. Prior to this date, Geisler was paid regularly with InterBank checks signed by O'Connor. Following the garnishment summons, however, this pattern of payment ceased. Indeed, starting July 21, 1995, Geisler started receiving checks from Atlantic Forex, rather than InterBank. Each of these Atlantic Forex checks was written by O'Connor's executive assistant, Joanna Miller, at the direction of O'Connor and Geisler, and then signed by O'Connor. Thereafter, on July 24, 1995, Miller, under the direction of O'Connor and Geisler, responded to the garnishment summons by stating that InterBank owed Geisler no funds and that it was not anticipated that InterBank would

---

**34.** This amount is supported by Geisler's employment contract with Interbank, executed in January 1995 and signed by him and O'Connor, which provided for annual compensation of $75,000, plus 15% of the pre-tax profits of Atlantic Forex and InterBank. The trial record also establishes that Geisler completed a loan application for Kay Jennings Toyota in which he stated that his annual wages were $70,000.

**35.** Geisler, like O'Connor, prepared his own tax returns, with O'Connor's knowledge and cooperation, and then directed Abouzied to sign and file the returns on his behalf.

owe funds to Geisler at any time in the future.

35. Approximately two years after the Roof Center garnishment summons was served on InterBank, Geisler knowingly filed, under oath, a 1996 income tax return falsely reporting yearly wages of $20,110. His true income for 1996 was, in fact, $93,657, consisting, again, of bi-weekly checks issued to him by Atlantic Forex and deposited into either the Cast, Inc. account or the UGM account.

## C. Purported Loans from InterBank and Atlantic Forex

36. On August 2, 1995, Geisler wrote a memorandum to Abouzied, with O'Connor's knowledge and cooperation, falsely advising him that the majority of the payments received by Geisler and O'Connor from InterBank and Atlantic Forex in 1994 were loans, rather than income. Thereafter, at the direction of O'Connor and Geisler, the books and records of InterBank were changed in this regard to reflect that the periodic payments to O'Connor and Geisler from InterBank and Atlantic Forex were loans, not income. Significantly, however, O'Connor and Geisler never provided their accountants, Abouzied or Samson, with documentation supporting these purported loans, despite repeated requests from them for such information. This purported loan scheme continued for several years and, by 1998, company records reflected that O'Connor had a loan balance of $1,060,863 and Geisler a loan balance of $492,037. All of the funds that O'Connor and Geisler obtained from InterBank in this regard, whether in the form of loans or income, came from the invasion of alien clients' purported escrow funds, since In-terBank had no other source of funds at the time.

37. Evidence that these payments were income, not loans, is that O'Connor and Geisler made no payments of interest or principal on these purported loans from 1994 through 1997. In April 1998, however, O'Connor made an actual loan repayment of $200,000, which was the exact amount of "loan" payments he received from InterBank in January and February of that year. Thus, he essentially returned the $200,000 shortly after receiving such funds from InterBank.[36] Additionally, in February and March 1998, O'Connor and Geisler each made a phantom $400,000 loan repayment to Atlantic Forex. They accomplished this illusion by circling money through the Bahamas in the same manner used to further the EB–5 scheme. Specifically, O'Connor and Geisler first directed that approximately $800,000 of In-terBank funds be wired to CIBC in the Bahamas. They then directed that the funds be wired back to personal bank accounts that had recently been opened in their names at FUNB in Virginia. Thereafter, O'Connor and Geisler each wrote a $400,000 check from their newly established FUNB personal accounts to Atlantic Forex, each stating in the memo section that the check was for a "return of loan." O'Connor and Geisler later falsely advised Samson that they had borrowed the $800,000 from CIBC in order to repay their loans to Atlantic Forex. This loan repayment scheme was a sham, an effort to disguise income as loans. The $800,000 used by O'Connor and Geisler came not from their own funds, but the funds of InterBank, consisting largely of the funds of the duped alien investors that were to

---

**36.** Notably, the $200,000 repayment occurred just two days after O'Connor and Geisler were confronted with a memorandum from Samson accusing them of misappropriating approximately 1.9 million dollars in client escrow funds.

have been held in escrow pending approval by the INS of their EB–5 applications.

38. In June 1998, Samson, who had not been able to reconcile various discrepancies in InterBank's financial records,[37] discussed the loan issue with O'Connor and Geisler, recommending that the purported loan payments received by them from InterBank and Atlantic Forex be reported as income on their federal tax returns. O'Connor and Geisler initially resisted this advice, but ultimately agreed to do so only after notice of the instant criminal investigation. In fact, the periodic payments O'Connor and Geisler received from Atlantic Forex and InterBank during the 1994–1997 period were, as they well knew, income, not loans.

### III. Bankruptcy fraud

39. On April 26, 1996, Geisler filed for bankruptcy in accordance with Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 1101 *et seq.*, listing over 15 creditors on the attached schedules. Among these creditors were the IRS and OCI Mortgage Corp., which, respectively, filed proofs of claim for $80,555 and $280,165. Nowhere in the bankruptcy schedules did Geisler list either InterBank or Atlantic Forex as a creditor.

40. On May 10, 1996, Atlantic Forex, at the direction of O'Connor and Geisler, began issuing bi-weekly salary checks to Geisler's wife, Adele Geisler, who was not employed by either InterBank or Atlantic Forex. These checks, which were each signed by O'Connor, were given to O'Connor's executive assistant, Joanna Miller, who subsequently cashed the checks and gave the proceeds to Geisler.[38] Geisler also caused Atlantic Forex to issue various checks to his personal creditors during the course of the bankruptcy proceedings.[39] And, in addition to the Atlantic Forex checks issued to Adele Geisler and Geisler's personal creditors, Geisler continued to receive bi-weekly checks payable to him from InterBank throughout the course of the bankruptcy proceedings. Only these bi-weekly checks were reported by Geisler to the bankruptcy court and thus deposited into his debtor in possession account. To conceal his true assets and income, Geisler never reported to the bankruptcy court the Atlantic Forex checks he caused to be issued to him, his wife and his creditors.

41. In a further effort to conceal his true assets and income, the record reflects that Geisler also knowingly made numerous false statements in connection with the bankruptcy proceedings. For example, on May 10, 1996, Geisler filed, under oath, bankruptcy schedules, together with attachments and a Statement of Financial Affairs, which stated falsely that his 1994 income was $28,000 and that his 1995 income was $24,000. In fact, Geisler had an actual income of $68,200 in 1994 and of $108,446 in 1995. *See supra,* ¶¶ 32–33. Geisler also knowingly failed to list the Cast, Inc. checking account on the Statement of Financial Affairs as an account which was held for his benefit within the

---

**37.** For example, in March 1998, Samson discovered that numerous alien investors' funds were not being held in escrow, as promised to the aliens by O'Connor and Geisler and those acting at their direction. This, of course, was because O'Connor and Geisler never placed these funds in escrow, but instead, commingled the funds with other InterBank funds and thereafter used the funds to further the fraudulent immigration scheme and for their own personal use, including the sham loan repayment scheme described *supra,* ¶ 37.

**38.** From April 1996 to March 1997, Adele Geisler received biweekly checks from Atlantic Forex in the amount of $1,650. Beginning in April 1997, however, this amount increased to $3,650.

**39.** *See infra,* ¶¶ 43–46.

previous year, despite the fact that he was the only signatory on that account. Indeed, to conceal the presence of this account, Geisler closed the Cast, Inc. account on May 7, 1996, three days prior to completing the Statement of Financial Affairs.

42. Several months later, on September 16, 1996, Geisler filed, under oath, a Monthly Operating Report Income Statement and a Cash Disbursements Summary Report for the month of August 1996. In these documents, both filed under oath, Geisler reported a monthly income of $2,552 and monthly disbursements of $2,600. Yet, Geisler knowingly failed to report as income $9,850 in checks issued by Atlantic Forex to Adele Geisler, and, as debt, a Capital One credit card in the amount of $500.[40]

43. The following year, on February 19, 1997, Geisler filed, under oath, a Monthly Operating Report Income Statement and Cash Disbursements Summary Report for January 1997. In these documents, Geisler reported a total income of $2,558 and total disbursements of $2,700. Yet again, he knowingly failed to report $11,150 in checks issued by Atlantic Forex to Adele Geisler, as well as a $1,000 payment made by Atlantic Forex to the Roof Center on Geisler's behalf. In this regard, Geisler knew full well that any payments made to creditors on his behalf had to be reported to, and approved by, the bankruptcy court.

44. Later that year, on June 16, 1997, Geisler filed, under oath, a Monthly Operating Report Income Statement and a Cash Disbursements Summary Report for the month of May 1997. Geisler reported a total income of $1,708 on the Monthly

Operating Report Income Statement and total disbursements of $1,800 on the Cash Disbursements Summary Report. Again, he knowingly failed to report on the Income Statement $7,700 in checks issued by Atlantic Forex to Adele Geisler. He also knowingly failed to report as disbursements (i) Atlantic Forex payments of $17,500 made to an attorney, Brad Rost, Esquire[41] and (ii) a $1,000 payment made by Atlantic Forex to the Roof Center on Geisler's behalf. Both of these payments were made to settle personal judgments obtained against Geisler.

45. Early the following year, on January 29, 1998, Geisler filed, under oath, a Monthly Operating Report Income Statement and a Cash Disbursements Summary Report for the month of November 1997. In these documents, Geisler reported a total monthly income of $1,708 and total cash disbursements of $1,950. Yet again, he knowingly failed to report as income $18,100 in Atlantic Forex payments made to Adele Geisler and, as disbursements, nearly $100,000 paid by Atlantic Forex to various creditors on his behalf. This amount included payments made to the following individuals and entities: (i) Andrew Geisler, in the amount of $5,000, (ii) Martin Turk, in the amount of $25,000, (iii) Scott Stephens, in the amount of $4,500, (iv) W.B. Allen, in the amount of $10,000, and (v) Richard Durishan, in the amount of $50,000.

46. Together with his November 1997 reports, Geisler also filed, under oath, his December 1997 Monthly Operating Report Income Statement and Cash Disbursements Summary Report. In the December documents, Geisler reported a total monthly income of $1,708 and total cash

---

**40.** The Capital One credit card, issued in the name of James A. Geisler, contained charges for jewelry at Hecht's and Elizabeth Arden, and clothing from Hong Kong.

**41.** Rost represented OCI Mortgage Corp. and C–Bass Property One, the successor in interest to OCI Mortgage Corp.

disbursements of $1,700. Once again, he knowingly failed to include as income $8,100 in payments made by Atlantic Forex to Adele Geisler and, as disbursements, $13,000 in payments made by Atlantic Forex to his personal creditors.

47. Despite the fact that many of Geisler's personal creditors were reimbursed in the course of the bankruptcy proceeding, through the use of Atlantic Forex checks, Geisler nonetheless falsely reported on each monthly bankruptcy report that he still owed the reimbursed creditors. Indeed, on each monthly report, Geisler reported that he owed various amounts to Durishan, Andrew Geisler, Allen, Turk, and Stephens and never decreased the reported amounts following the payments made on his behalf by Atlantic Forex.

48. On February 3, 1998, Geisler's bankruptcy case was dismissed.

## CONCLUSIONS OF LAW

### I. Immigration fraud (Counts 2–25) [42]

 49. To prove a charge of immigration fraud, in violation of 18 U.S.C. § 1546(a), as charged against O'Connor and Geisler in Counts 2–25 of the Indictment, the government must prove each of the following elements beyond a reasonable doubt: (1) that defendants made a false statement in an immigration document, (2) that the false statement was made knowingly, (3) that the false statement was material to INS activities or decisions, (4) that the false statement was made under oath, and (5) that the false

statement was made in an application required by the immigration laws or regulations of the United States. *See* 18 U.S.C. § 1546(a); *United States v. Chu,* 5 F.3d 1244, 1247 (9th Cir.1993). In this context, false information submitted to the INS is material if it would have influenced a decision of the INS. *See Kungys v. United States,* 485 U.S. 759, 770–72, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988); *United States v. Puerta,* 982 F.2d 1297, 1301 (9th Cir. 1992).

■ 50. The record evidence establishes beyond a reasonable doubt that each of the elements is satisfied and compels the conclusion that O'Connor and Geisler are guilty of immigration fraud, as charged in Counts 2 through 25 of the Indictment. Indeed, the record reflects that O'Connor and Geisler knowingly made false statements in numerous EB–5 applications filed, under oath, with the INS on behalf of InterBank's alien clients. Specifically, they knowingly directed that each EB–5 application falsely represent that the particular alien client had invested the requisite $500,000 in the InterBank EB–5 program when, in fact, they did not. Indeed, most clients invested only between $100,000 and $150,000, others invested only $50,000 and still others invested nothing at all. O'Connor and Geisler also knowingly failed to disclose in each EB–5 application that the majority of the alien clients' invested funds were actually comprised of a sham Bahamian loan which, in all cases, originated from InterBank funds.[43] The

---

**42.** Because the offense of immigration fraud is an object of the conspiracy charged in Count 1, discussion of the underlying immigration fraud offenses is included prior to discussion of the conspiracy offense.

**43.** O'Connor and Geisler claim they are being charged with making false statements to the INS which were not charged in the Indictment, including false statements or omissions

about the sham Bahamian loan scheme. In this regard, the Indictment charges O'Connor and Geisler with falsely representing to the INS that alien clients had made the requisite $500,000 investment in the EB–5 program when, in fact, they had not. Contrary to defendants' argument, this false statement necessarily includes, *inter alia,* the concealment of the sham Bahamian loan scheme.

bogus nature of the Bahamian loan scheme is fully evidenced by the trial record, including (i) the failure of O'Connor and Geisler to execute loan documents on behalf of most alien clients and (ii) the issuance by Jones, through Beaumont, of worthless annuities on behalf of alien clients.

51. O'Connor and Geisler caused these false statements and omissions to be made on numerous EB–5 applications, including applications filed on behalf of Denise DeOliveira (Count 2), Mathilde Dardi (Counts 3 and 4), Carlo Barbieri (Counts 5 and 6), Kruparao Kancharla (Counts 7 and 8), Elizabeth Conway (Counts 9 and 10), Marie–Helene Ndama (Counts 11 and 12), Roger Matteau (Counts 13 and 14), Steven Matteau (Count 15), Franco Tamborra (Counts 16 and 17), Chee Seng Tan (Counts 18 and 19), Simon Oliver (Counts 20 and 21), Henri Rochard (Count 22), Bishnu Shrestha (Count 23), Megha Shrestha (Count 24) and Archana Shrestha (Count 25).

■ 52. The false statements and omissions directed by O'Connor and Geisler were material to the INS, as such information affected whether the proposed financing met the INS regulatory requirements, including the requirements (i) that the financing met the definition of "capital," (ii) that the debt was secured by the assets of the alien, not of the commercial enterprise, and (iii) that the alien was personally and primarily liable for the debt. *See* 8 C.F.R. § 204.6(e). As the credible and uncontradicted testimony of INS adjudication officer Renwick confirmed, had O'Connor and Geisler provided truthful and complete information to the INS on the EB–5 applications filed on behalf of InterBank's alien clients, none would have been approved.

## II. False Tax Returns (Counts 49–50 and 53–55) [44]

■ 53. The essential elements of the offense of filing a false income tax return, in violation of 26 U.S.C. § 7206(1), as charged against O'Connor in Counts 49–50 and against Geisler in Counts 53–55, are: (1) that the defendant made and signed a tax return that was filed with the IRS which contained false information, (2) that the defendant knew the information was false, (3) that the false statement was material, (4) that the return contained a written declaration that it was being signed subject to the penalty of perjury and (5) that the defendant acted willfully. *See* 2B O'Malley, Grenig & Lee, *Federal Jury Practice and Instructions,* § 67.15 (5th ed.2000); *United States v. Bishop,* 412 U.S. 346, 350, 359, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973). In this regard, a material matter is any statement that has a natural tendency to influence or impede the IRS in determining the correctness of a tax return and, in all cases, a correct amount of income is clearly a material matter. *See United States v. Aramony,* 88 F.3d 1369, 1384–85 (4th Cir.1996). Additionally, willfulness in this context means "voluntary, intentional violation of a known legal duty." *Cheek v. United States,* 498 U.S. 192, 201, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991).

■ 54. The presence of each of these elements here compels the conclusion that O'Connor is guilty beyond a reasonable doubt of Counts 49–50, and Geisler is guilty beyond a reasonable doubt of Counts 53–55. Indeed, as detailed in ¶¶ 23 and 25, *supra,* O'Connor prepared and caused to be filed, under oath, income tax returns for tax years 1993 and 1994 in which he knowingly and willfully under reported his income by thousands of dol-

---

**44.** Again, because tax fraud is an object of the conspiracy charged in Count 1, discussion of the underlying tax offenses is included prior to discussion of the conspiracy offense.

lars. Similarly, as set forth in ¶¶ 32–33 and 35, *supra,* Geisler prepared and caused to be filed, under oath, income tax returns for tax years 1994, 1995 and 1996 in which he, too, knowingly and willfully under reported his true annual income. And, the false annual income amounts[45] knowingly reported in each of the tax returns filed on behalf of O'Connor and Geisler were clearly material, as such false amounts had "a natural tendency to influence or impede the IRS" in determining the correctness of the tax returns. *See Aramony,* 88 F.3d at 1384–85.[46]

### III. Failure to File Tax Returns (Counts 51 and 52)[47]

 55. The essential elements of failure to file a tax return in violation of 26 U.S.C. § 7203, as charged against O'Connor in Counts 51 and 52, are: (1) that the defendant was required by law or regulation to file a tax return concerning his income, (2) that the defendant failed to file such a return at the time required by law, and (3) that in failing to file the tax return, the defendant acted willfully. *See* 2B O'Malley, Grenig & Lee, *Federal Jury Practice and Instructions,* § 67.11 (5th ed.2000). *See also United States v. Ostendorff,* 371 F.2d 729, 730 (4th Cir.), *cert. denied,* 386 U.S. 982, 87 S.Ct. 1286, 18 L.Ed.2d 229 (1967). Again, as indicated in ¶ 53, *supra,* willfulness in this context means "voluntary, intentional violation of a known legal duty." *Cheek,* 498 U.S. at 201, 111 S.Ct. 604.[48]

 56. Because each of these elements has been established on this record beyond a reasonable doubt, it necessarily follows that O'Connor is guilty of failure to file timely tax returns as charged in Counts 51 and 52. Indeed, O'Connor was required to file income tax returns for tax years 1995 and 1996 given that his annual income exceeded $11,550 for each of those years. *See* 26 U.S.C. § 6012. Yet, despite knowledge of the IRS filing requirements, he willfully failed to file these 1995 and 1996 returns in a timely manner.

---

**45.** That these amounts were indeed income, not loans, is established by the record evidence, including the fact that O'Connor and Geisler failed to make any payments of interest or principal on any purported loans from 1994 through 1997. *See United States v. Pomponio,* 563 F.2d 659 (4th Cir.1977) (noting that the absence of executed notes, the absence of a fixed repayment date, the lack of interest charged or paid and the failure to provide security for a loan default all supported the conclusion that payments from a closely held corporation were income, not loans). And, O'Connor's and Geisler's claim that they had the intent to repay the purported loans is clearly contradicted by the evidence, including the sham $800,000 loan repayment made by O'Connor and Geisler in February and March 1998. *See* ¶ 37, *supra.* Moreover, the argument that O'Connor's $200,000 "loan repayment" in 1998 somehow "validates" the fact that the funds received by him and Geisler from InterBank were loans, not income, is simply unpersuasive in the circumstances.

**46.** The fact that O'Connor or Geisler may have suffered a net operating loss during a particular year does not change the fact that their personal income tax returns were false, as it is only their failure to report income that is charged in the Indictment.

**47.** This offense, too, is an object of the conspiracy charged in Count 1, and thus, is discussed prior to the conspiracy offense.

**48.** O'Connor misstates the definition of willfulness, arguing that the government is required to prove that he had a bad purpose or an evil motive in failing to file his tax returns. This is simply incorrect. *See, e.g., United States v. Schafer,* 580 F.2d 774, 781 (5th Cir.) (recognizing that the government does not have to prove an evil motive or bad intent in a tax case), *cert. denied,* 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978); *United States v. Dillon,* 566 F.2d 702, 704 (10th Cir.1977) (stating that the government does not have to show that a defendant acted with bad purpose or evil motive to be convicted under 26 U.S.C. § 7203).

57. O'Connor's failure to file timely returns is not excused by the absence of a tax liability for a particular year and his failure to file timely returns in the past is evidence of his willful failure to file tax returns in 1995 and 1996. *See United States v. Ramantanin*, 452 F.2d 670, 672 (4th Cir.1971); *United States v. Farris*, 517 F.2d 226, 229 (7th Cir.1975). Indeed, O'Connor's persistent pattern of (i) filing false returns and (ii) failing to file returns indicates that his behavior in failing to file timely 1995 and 1996 returns was intentional and not the result of negligence. *See United States v. Krzyske*, 836 F.2d 1013, 1019–20 (6th Cir.1988) (approving an instruction to the jury that a pattern of behavior may be considered in determining whether the defendant intentionally attempted to evade and defeat taxes for the years charged in the indictment). And, the fact that O'Connor ultimately filed his delinquent 1995 and 1996 returns in 1998, after learning of an investigation, does not relieve him of criminal liability for his initial failure to file. *See United States v. Crawford*, 121 F.3d 700, 1997 WL 532495 (4th Cir.1997) (recognizing that delinquent filing of a return does not relieve a taxpayer of criminal liability) (citations omitted).

## IV. Conspiracy to Commit Immigration Fraud, Wire Fraud and Tax Fraud (Count 1)

58. To prove the conspiracy charged in Count 1 of the Indictment, in violation of 18 U.S.C. § 371, the government must prove each of the following three elements beyond a reasonable doubt: (1) that the charged conspiracy was formed, reached or entered into by two or more persons, (2) that at some point during the existence or life of the conspiracy, defendants knew the purpose of the conspiracy and, with that knowledge, then deliberately joined the conspiracy, and (3) that at some point during the existence or life of the conspiracy, one of its alleged members knowingly performed one of the overt acts [49] charged in the indictment and did so in order to further or advance the purpose of the conspiracy. *See* 2B O'Malley, Grenig & Lee, *Federal Jury Practice and Instructions*, § 27.08 (5th ed.2000). *See also United States v. Chorman*, 910 F.2d 102, 109 (4th Cir.1990) (recognizing that to prove a charge of conspiracy under 18 U.S.C. § 371, the government must prove (1) an agreement between two or more people to commit a crime, and (2) an overt act taken in furtherance of the conspiracy). The conspiracy charged in Count 1 of the Indictment has five objects,[50] three relating to immigration fraud, one relating to tax fraud, and one relating to wire fraud. Specifically, these five charged objects are as follows:

(1) To defraud the United States by impairing, obstructing and impeding the lawful function of the INS by obtaining immigration benefits for aliens

---

**49.** The term "overt act" means some type of outward objective action performed by one of the members of the conspiracy which evidences that conspiracy. *See* 2 O'Malley, Grenig & Lee, *Federal Jury Practice and Instructions*, § 31.07 (5th ed.2000). And, in this regard, the government is not required to prove beyond a reasonable doubt all of the overt acts alleged in the indictment; proof that at least one overt act was committed in furtherance of the conspiracy is sufficient.

*See United States v. Anderson*, 611 F.2d 504, 510 (4th Cir.1979).

**50.** The government need only prove one object of the charged conspiracy to support a conviction under 18 U.S.C. § 371. *See United States v. Mackey*, 571 F.2d 376, 387 n. 14 (7th Cir.1978) (citing *United States v. Papadakis*, 510 F.2d 287, 297 (2d Cir.1975); *United States v. Grizaffi*, 471 F.2d 69, 73 (7th Cir. 1972)).

through the use of false statements and fraud;

(2) To defraud the United States by impeding, impairing, obstructing, and defeating the lawful functions of the IRS in the ascertainment, computation, assessment, and collection of income taxes;

(3) To knowingly and unlawfully obtain, accept, and receive visas and alien registration receipt cards, knowing them to have been procured by means of false claims and statements and to have been otherwise procured by fraud, in violation of 18 U.S.C. § 1546(a);

(4) To knowingly and unlawfully, under penalty of perjury, subscribe as true, false statements with respect to material facts in applications, affidavits, and other documents required by the immigration laws and regulations prescribed thereunder, and knowingly present such applications, affidavits, and other documents which contain such false statements, in violation of 18 U.S.C. § 1546(a); and

(5) To devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and then knowingly and unlawfully transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, and signals for the purpose of executing such scheme and artifice, in violation of 18 U.S.C. § 1343.

■ 59. A review of the record here reveals that the conspiracy charged in Count 1, including each of its five objects, has been proven by the government beyond a reasonable doubt. Indeed, the record establishes that O'Connor and Geisler jointly devised and engaged in a complex scheme to defraud the INS in connection with the "Invest in America" EB–5 program. And, in doing so, they knowingly sought to obtain, and obtained, immigration benefits for various alien investors through the use of false statements, made under oath, to the INS. Both O'Connor and Geisler knew the EB–5 applications submitted on behalf of alien clients contained false and materially misleading information and each knowingly committed and/or directed numerous acts in furtherance of the fraudulent scheme. For example, the preparation and filing of each false EB–5 application constitutes a separate overt act taken in furtherance of the overall scheme.

■ 60. O'Connor and Geisler also jointly engaged in a scheme to conceal income and to defraud the IRS in the computation and collection of legally required amounts of federal income tax. Indeed, each assisted the other in concealing large amounts of annual income by, *inter alia*, (i) causing InterBank and/or Atlantic Forex to issue regular checks to Ann O'Connor and Adele Geisler, who were not employed by either entity, which checks were later endorsed and used by O'Connor and Geisler for their own personal uses and (ii) directing that InterBank's records be amended on various occasions to reflect that their annual incomes were substantially less than they actually were.

■ 61. Wire fraud, the remaining object of the charged conspiracy, involves three essential elements, namely: (1) that the defendants knowingly devised or intended to devise a scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representations, or promises, (2) that the defendants did so with the intent to defraud, and (3) that in advancing, furthering, or carrying out this scheme to defraud

or to obtain money or property by means of false or fraudulent pretenses, representations, or promises, the defendants transmitted any writing, signal, or sound by means of a wire communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire communication in interstate commerce. *See* 2A O'Malley, Grenig & Lee, *Federal Jury Practice and Instructions*, § 47.07 (5th ed.2000); *See also United States v. Mora*, —— F.3d —— (Table), 2001 WL 856095 (4th Cir. July 31, 2001) (recognizing that the factual elements of wire fraud under 18 U.S.C. § 1343 are (1) a scheme to defraud, (2) use of an interstate wire in furtherance of the scheme, and (3) statements or omissions in the wire communication that were material to the scheme).[51]

■ 62. Each of these elements is established in the record beyond a reasonable doubt. Thus, the record shows that O'Connor and Geisler jointly devised a scheme to obtain money from various alien investors, and to obtain immigration benefits on behalf of those alien investors, through the use of false representations. It is equally clear that they did so with the intent to defraud both the alien investors, as well as the INS. And, in furtherance of this scheme, O'Connor and Geisler often relied on the use of wire communications, including telephone, facsimile and wired money transfers. Specifically, in addition to the use of wire communications to transfer funds to and from the Bahamas in furtherance of the sham Bahamian loan scheme, as detailed previously in ¶¶ 8 and 14, *supra*, O'Connor and Geisler also directed that various transfer instructions be delivered from InterBank to the Bahamas

by facsimile. They also received by facsimile the misleading FUNB print screens ultimately submitted to the INS in support of various EB–5 applications. Additionally, many alien clients provided InterBank with their entire EB–5 investment, plus the $20,000 processing fee, by means of wire. And finally, the InterBank sales staff, at the direction of O'Connor and Geisler, often marketed and sold the EB–5 program to alien clients through the use of telephone communications. All of these wire communications were made with the knowledge of, and indeed, at the direction of, O'Connor and Geisler, for the purpose of facilitating their overall scheme to defraud both the alien investors and the INS. And, each of these wire communications was material to the success of the fraudulent scheme.

63. Given that O'Connor and Geisler willfully formed and became members of the specific conspiracy charged in the Indictment, including all five of its objects, and that both knowingly committed numerous overt acts in furtherance of that conspiracy, it necessarily follows that both are guilty of Count 1 of the Indictment.

## V. Money laundering (Counts 27–48)

■ 64. To prove the substantive offense of money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A), as charged against O'Connor and Geisler in Counts 27 through 48 of the Indictment, the government must prove each of the following three elements beyond a reasonable doubt: (1) that on or about the dates described in the indictment, the defendants knowingly transmitted and transferred monetary instruments or funds, (2) that the defendants did so with the intent to promote the carrying on of an unlawful purpose, and (3)

---

**51.** O'Connor and Geisler claim they were not on notice that (i) wire fraud and (ii) defrauding the alien investors were part of the charged conspiracy. Despite this argument,

the Indictment clearly includes both of these aspects of the case in the description of conduct charged in Count 1, and thus, O'Connor and Geisler had ample notice in this regard.

that the transmittal and transfer of funds was from a place in the United States to a place outside the United States or vice versa. *See* 18 U.S.C. § 1956(a)(2)(B)(i).[52] *See also United States v. Baker,* 985 F.2d 1248, 1252 (4th Cir.1993).

65. The record compels the conclusion that each of these elements has been proven beyond a reasonable doubt and thus, O'Connor and Geisler are guilty of money laundering, as charged in Counts 27 through 48 of the Indictment. First, on various dates in 1997 and 1998, O'Connor and Geisler knowingly directed the transmittal and transfer of large amounts of money from a bank account controlled by InterBank in Virginia, to CIBC in the Bahamas, purportedly on behalf of various InterBank alien clients. *See* ¶¶ 8 and 14, *supra.* They also knowingly directed that such funds then be transmitted back from the Bahamas to various FBO accounts set up in the names of particular alien clients at FUNB in Virginia. And significantly, each of these transmittals and transfers was directed by O'Connor and Geisler in order to promote the carrying on of their unlawful scheme to defraud the alien investors and the INS in connection with InterBank's "Invest in America" EB–5

program. Indeed, the transfer of funds to and from the Bahamas was an integral part of the underlying scheme, as it helped to conceal the fraudulent nature of the Bahamian loan transactions and led to the production of misleading print screens reflecting a balance of $500,000 in numerous alien clients' FBO accounts. The use of monetary transfers to lend an "aura of legitimacy" to a particular transaction, as was done here, has been held to constitute sufficient evidence of intent to promote a specified unlawful activity. *See United States v. Savage,* 67 F.3d 1435, 1440 (9th Cir.1995) (quoting *United States v. Johnson,* 971 F.2d 562, 566 (10th Cir.1992)).

## VI. Conspiracy to Commit Money Laundering (Count 26)

66. To prove the charge of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), as charged against O'Connor and Geisler in Count 26 of the Indictment, the government must prove the following two elements beyond a reasonable doubt: (1) that the conspiracy, agreement, or understanding to commit money laundering was formed or entered into by two or more

---

**52.** Defendants argue that the substantive counts of money laundering "merge" with the specified unlawful activity (SUA) included in the elements of those counts, thus precluding independent liability for money laundering. Several Fourth Circuit decisions analyzing the offense of money laundering under 18 U.S.C. § 1957 address the question whether the offense of money laundering and the underlying SUA merge, in light of the requirement of § 1957 that "the laundering of funds cannot occur in the same transaction through which those funds first become tainted by crime." *United States v. Butler,* 211 F.3d 826, 830 (4th Cir.2000). *See also United States v. Smith,* 44 F.3d 1259, 1265 (4th Cir.1995). There is no such concern where, as here, the money laundering offenses are charged under § 1956(a)(2)(A), given that § 1956(a)(2)(A) contains no proceeds requirement similar to that contained in § 1957. *See, e.g., United States v. Piervinanzi,* 23 F.3d 670, 679–80 (2d

Cir.1994) (rejecting argument that wiring money to a place outside the United States merges with the underlying bank fraud, therefore precluding liability under § 1956(a)(2)(A)). Moreover, even assuming there was a merging problem with money laundering offenses under § 1956(a)(2)(A), the SUA of wire fraud involved in this case was sufficiently complete for money laundering purposes each time an alien provided money to InterBank, and the subsequent wiring of some or all of that money by O'Connor and Geisler to the Bahamas was a separate and distinct transaction. *See, e.g., United States v. Mankarious,* 151 F.3d 694, 706 (7th Cir.1998) (recognizing that a mail fraud offense does not have to be complete for money laundering purposes; all that matters is that the mail fraud scheme has produced proceeds in transactions distinct from those constituting money laundering).

persons at or about the time alleged, and (2) that at some time during the existence or life of the conspiracy, agreement, or understanding, the defendants knew the purpose of the agreement, and then knowingly joined the conspiracy, agreement, or understanding. *See* 18 U.S.C.1956(h). *See also United States v. Meshack,* 225 F.3d 556, 573–74 (5th Cir.2000) (stating that the elements of a conspiracy to commit money laundering conviction are: (1) that there was an agreement between two or more persons to commit money laundering, and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose).

■ 67. Here, because the government has proven these two essential elements beyond a reasonable doubt, O'Connor and Geisler are guilty of Count 26 of the Indictment. Specifically, the record reflects that beginning in 1996, shortly after InterBank began marketing and selling the EB–5 program, O'Connor and Geisler agreed jointly to promote the program and, in the process, advance their own business interests, by directing the transmittal and transfer of large amounts of funds from accounts controlled by Inter-Bank in Virginia to CIBC in the Bahamas, and then back to Virginia. *See* ¶¶ 8 and 14, *supra.* And clearly, O'Connor and Geisler were both fully aware at all times during the life of the conspiracy that each transmittal and transfer of funds was intended to promote their unlawful scheme to defraud the alien investors and the INS in connection with the EB–5 program.

### VII. Bankruptcy Fraud (Counts 56–61)

■ 68. The essential elements of a charge of bankruptcy fraud, in violation of 18 U.S.C. § 152, as charged against Geisler in Counts 56 through 61, are: (1) that a bankruptcy proceeding was in existence on or about the date alleged in the

indictment, (2) that the defendant made, or caused to be made, a false statement in connection with that bankruptcy proceeding, (3) that the defendant knew that the statement was false and (4) that the false statement related to a material matter. *See* O'Malley, Grenig & Lee, *Federal Jury Practice and Instructions,* § 26.07 (5th ed.2000); *United States v. Overmyer,* 867 F.2d 937, 949 (6th Cir.1989).[53] In this context, a statement relates to a material matter if it bears relation to the debtor's business transactions or concerns the discovery of the debtor's assets or income. *See United States v. Key,* 859 F.2d 1257, 1261 (7th Cir.1988) (citations omitted).

■ 69. Given that all of the elements of bankruptcy fraud have been established here beyond a reasonable doubt, Geisler is guilty of each of the offenses charged in Counts 56 through 61 of the Indictment. Specifically, as detailed in ¶¶ 41–46, *supra,* Geisler made numerous false statements in connection with the Chapter 11 bankruptcy proceeding that he initiated on April 26, 1996. Such false statements were made on May 10, 1996 (Count 56), September 16, 1996 (Count 57), February 19, 1997 (Count 58), June 16, 1997 (Count 59) and January 29, 1998 (Counts 60 and 61). Geisler made each of these false statements knowingly, in order to conceal his actual assets and income, and each concerned material matters. Indeed, in each instance, Geisler either (i) failed to report accurately his monthly income, (ii) failed to report financial accounts held in his name or on his behalf or (iii) failed to report payments made to personal creditors on his behalf.

### VIII. Defense of Reliance on Professional Advice

■ 70. O'Connor and Geisler, as an affirmative defense, attempt to rely on the alleged legal advice of James Schmidt in connection with the fraud and money laundering aspects of their case, and on the

---

**53.** Contrary to Geisler's assertions, the government is not required to prove that a loss was suffered as a result of a false statement made in the course of the bankruptcy pro-

ceeding. *See United States v. Pritt,* 238 F.3d 417 (Table), 2000 WL 1699833, at * 10, n. 12 (4th Cir. Nov.14, 2000); *United States v. Gellene,* 182 F.3d 578, 586–87 (7th Cir.1999).

alleged tax and accounting advice of Fathy Abouzied in connection with the tax and bankruptcy aspects of their case.[54] To establish the defense of reliance on professional advice, defendants must produce some evidence—more than a scintilla—showing that:[55] (i) the advice was sought and received before taking action, (ii) they in good faith sought the advice of a professional whom they considered competent, (iii) the purpose of securing advice was to determine the lawfulness of future conduct, (iv) a full and accurate report was made to the professional of all material facts which the defendants knew and (v) they acted strictly in accordance with the advice of the professional who had been given a full report. *See United States v. Polytarides*, 584 F.2d 1350, 1352 (4th Cir. 1978). More recently, the Fourth Circuit consolidated these five elements into two, namely (i) full disclosure of all pertinent facts to an expert, and (ii) good faith reliance on the expert's advice. *See United States v. Butler*, 211 F.3d 826, 833 (4th Cir.2000) (citing *United States v. Miller*,

658 F.2d 235, 237 (4th Cir.1981)). Applying either standard here, the affirmative defense of reliance on professional advice necessarily fails.[56]

█ 71. Specifically, in connection with the fraud and money laundering aspects of their case, O'Connor and Geisler attempt to rely on the alleged legal advice of James Schmidt. As discussed previously in ¶ 20, *supra*, the record is devoid of any indication whatsoever that either O'Connor or Geisler, collectively or independently, sought or received a legal opinion, either oral or written, from Schmidt. Indeed, the grand jury testimony of Schmidt confirms the conclusion that defendants did not seek a legal opinion from Schmidt, but rather, sought his assistance in introducing them to an offshore bank willing to participate in the Invest in America program. *See* ¶¶ 7 and 20, *supra*. The trial record does indeed establish that Schmidt authored an opinion letter in the course of the fraudulent immigration scheme, but this letter was addressed only to Jones, on behalf of CIBC, and was

54. The trial record reflects that the defense of reliance on professional advice, as raised by O'Connor and Geisler in this case, rests solely on the alleged advice of Schmidt and Abouzied.

55. It is constitutionally permissible to place on a defendant the burden of producing some evidence to establish an affirmative defense. *See United States v. McMichael*, 948 F.2d 1283 (Table), 1991 WL 237652, at *1 (4th Cir. Nov. 15, 1991) (recognizing that it is constitutionally permissible to require "defendant to establish a defense to the crime charged so long as the prosecution has sufficiently established its prima facie case") (citing *Patterson v. New York*, 432 U.S. 197, 203 n. 9, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)). And, it is also settled that reliance on professional advice is an affirative defense that a defendant must establish. *See United States v. Scott* 37 F.3d 1564, 1583 (10th Cir.1994); *United States v. Masat*, 948 F.2d 923, 930 (5th Cir.1991); *Liss v. United States*, 915 F.2d 287, 291 (7th Cir. 1990). Yet, it is important to note that this in no way shifts the ultimate burden of proof, which remains on the prosecution. It is equally important to note that "the law places

no burden on any defendant to prove an affirmative defense beyond a reasonable doubt." *United States v. Gonzalez*, 58 F.3d 506, 512 (10th Cir.1995). To the contrary, the defendant need only produce "more than a scintilla of evidence" reguarding an affirmative defense, while the burden remains on the government to prove beyond a reasonable doubt every element of the offenses charged and that the affirmative defense has not been established. *See United States v. Sligh*, 142 F.3d 761, 762 (4th Cir.1998) (discussing affirmative defense of entrapment).

56. As to the defense of reliance on professional advice, O'Connor and Geisler rely on *Bursten v. United States*, 395 F.2d 976 (5th Cir. 1968), which, contrary to their contentions, requires elements essentially identical to those identified in *Polytarides*, 584 F.2d at 1352. Indeed, in *Bursten*, the Fifth Circuit concluded that to establish the defense of reliance on professional advice, full disclosure to a professional is not sufficient by itself; rather a defendant must also establish that the professional was competent and providing independent advice that was followed in good faith by the defendant. *See Bursten*, 395 F.2d at 982.

written at the express request of CIBC. Nonetheless, even assuming this opinion letter was requested by, or directed to, O'Connor and Geisler, which it was not, the letter in no way addressed the legality of the overall scheme, including whether the Bahamian loans were valid, whether the scheme complied with INS regulations or whether the scheme involved money laundering. Moreover, the substance of the opinion letter makes clear that O'Connor and Geisler were not forthright and truthful to Schmidt regarding the Bahamian loan scheme. *See* ¶ 20, *supra.* And finally, the record reflects that O'Connor and Geisler formed the intent to put the fraudulent immigration scheme in motion long before Schmidt authored the March 7, 1997 letter. Indeed, O'Connor and Geisler took significant steps in furtherance of the scheme as early as 1995 and 1996. *See* ¶¶ 2–3, *supra.* For all of these reasons, defendants' attempt to rely on the alleged legal advice of Schmidt is fruitless.

■ 72. In connection with the tax and bankruptcy aspects of their case, O'Connor and Geisler attempt to rely on the alleged tax and accounting advice of their accountant, Fathy Abouzied. The record evidence, however, establishes that all of the actions undertaken by Abouzied in connection with defendants' financial and tax records, both personally and on behalf of InterBank, were undertaken at the specific request of O'Connor and Geisler. Indeed, it is pellucidly clear that Abouzied simply followed their instructions at all times, and in all respects, no matter what the consequences. Despite their contentions, defendants failed to produce any credible evidence (i) that they sought or received the competent, professional advice of Abouzied, (ii) that they relied on any such advice, or (iii) that they provided him with complete disclosure regarding their true financial situation. To the contrary, the evidence reveals that Abouzied (i) acted at all times at the express direction of O'Connor and Geisler, (ii) made

no independent, professional decisions on behalf of O'Connor and Geisler and (iii) did not seek to verify or audit any of the financial information provided to him by O'Connor and Geisler. Moreover, Abouzied either did not know about the employment contracts setting out O'Connor's and Geisler's annual income, in which case he was not fully informed by O'Connor and Geisler, or he did know about the employment contracts, in which case he was a part of O'Connor's and Geisler's fraudulent scheme to conceal income. That Abouzied kept two separate sets of financial records for InterBank, a practice in aid of the fraudulent concealment of income, suggests the latter. Given all of these circumstances, defendants' attempt to rely on the alleged professional advice of Abouzied in connection with the tax and bankruptcy portions of their case likewise fails.

## IX. Conclusion

The facts found from the record beyond a reasonable doubt establish conclusively that O'Connor and Geisler are guilty of each of the offenses charged against them in the Indictment. Specifically, O'Connor is guilty of (i) conspiracy to commit immigration fraud, tax fraud and wire fraud (Count 1), (ii) immigration fraud (Counts 2–25), (iii) conspiracy to commit money laundering (Count 26), (iv) money laundering (Counts 27–48), (v) filing false income tax returns (Counts 49–50) and (vi) failure to file income tax returns (Counts 51–52). Geisler, in turn, is guilty of (i) conspiracy to commit immigration fraud, tax fraud and wire fraud (Count 1), (ii) immigration fraud (Counts 2–25), (iii) conspiracy to commit money laundering (Count 26), (iv) money laundering (Counts 27–48), (v) filing false income tax returns (Counts 53–55) and (vi) bankruptcy fraud (Counts 56–61).

An appropriate Order will issue.