# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-1990

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

LINDA K. FRYKHOLM,

*Defendant.*

Intervening Third-Party Claimant:
   COTSWOLD TRADING COMPANY, LTD.,

*Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 00 CR 50001—**Philip G. Reinhard**, *Judge.*

_____

ARGUED FEBRUARY 27, 2004—DECIDED MARCH 25, 2004

_____

Before EASTERBROOK, MANION, and EVANS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Linda Frykholm must have the tongue of an angel, though she has the morals of a fiend. She persuaded people to invest $15 million in a get-rich-quick scheme, even though the promises she made were transparently too good to be true (100% return in a month) and she had no means to back her promises. Her

only relevant credential was a 1994 conviction for theft and forgery, which she did not tout; her "business address" was a mail drop; routine inquiry would have disclosed that the corporations through which she purported to do business did not exist and that Illinois securities officials had entered a stop order against her promotions. Her persuasiveness was augmented, however, by the staple ingredient of any Ponzi scheme: the first generation of investors was handsomely rewarded with money being raised from the next generation, and these ecstatic clients became her avid promoters. Yet collapse was inevitable. The system works only while each new generation of investors puts in at least twice as much as the last, and exponential growth cannot last: after a few doublings there aren't enough suckers left in the whole world. When Frykholm's scam imploded she had net receipts of about $10 million (having taken in $15 million and paid out $5 million), of which prosecutors have been able to locate some $4 million; the rest either was devoted to living the high life or has been hidden someplace from which Frykholm hopes to retrieve it after her release. (We affirmed her sentence, 144 months' imprisonment, in *United States v. Frykholm*, 267 F.3d 604 (7th Cir. 2001).) At least the asset recoveries are enough to return about 30% of the victims' losses.[†] Forfeiture of all assets traceable to the scam's proceeds is part of Frykholm's sentence, and the United States plans to use these assets to make restitution to victims, as 21 U.S.C. §853(n)(1) permits.

---

[†]   The figures in the text might lead one to think that the payout would be closer to 40%, but that's not right. Frykholm paid out the $5 million against about $2.5 million in investment. That's why the first wave of investors was so enthusiastic. The unpaid investors chipped in about $12.5 million, and $4 million is available to them. If Cotswold prevails in this litigation, then about $1.8 million will be left to satisfy about $9 million in victims' claims.

Title to all forfeitable assets vests in the United States as soon as criminal proceeds are invested; a judgment of forfeiture just confirms that this has occurred. 21 U.S.C. §853(c). Third parties who acquire interests in the property between the date of the act allowing forfeiture and the date of the judgment may be taken unawares, and §853(c) shelters their interests to the extent that "the transferee establishes in a hearing pursuant to subsection (n) that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section."

Cotswold Trading Company, one of Frykholm's victims, made a claim to some of her assets under §853(c). Cotswold entrusted a total of $1.1 million to Frykholm. The initial investment of $100,000, made in March 1999, was to be doubled and repaid within 35 days. When Frykholm did not keep her promise, Cotswold decided to throw good money after bad. It invested another $1 million in exchange for a promise that Frykholm would deliver $2 million within 13 business days. That money came due in mid-July 1999. Again Frykholm did not pay, though she used several variations on "the check is in the mail". Cotswold then "reinvested" the promised but unpaid $2 million in exchange for Frykholm's promise to pay it $4 million within 15 banking days. That obligation came due in late August 1999. All Frykholm delivered was more promises.

Cotswold's lawyer and its principal owner protested by phone, fax, and letter; they threatened to file suit and report Frykholm to the U.S. Attorney. Frykholm continued making promises, but the wire transfers never materialized and her checks bounced. In November 1999 Frykholm and Cotswold executed a settlement and release. Frykholm gave Cotswold a promissory note for $2.2 million due in 100 days and secured by her interest in real estate on Lake Geneva, Wisconsin. For convenience we call this parcel, at 1982

North Lake Shore Drive in Delavan, Walworth County, Wisconsin, "the Property." Frykholm had purchased the Property for $2,280,000 in January 1999. She paid with 17 checks written by other victims of the scam, so the Property was unencumbered until Frykholm gave Cotswold a mortgage. In January 2000 Frykholm was indicted, and the United States filed a *lis pendens* against the Property. Frykholm never paid the $2.2 million due on the note, and Cotswold now wants to enforce its security interest.

The Property is among the assets ordered forfeited to the United States as representing proceeds of the crime. Cotswold asserted that its interest is superior under §853(c) and (n)(6)(B). The latter subsection says that a third party prevails if it "is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section". Cotswold contends that it is a bona fide purchaser for value under Wisconsin law, having given as "value" either the $1.1 million it invested or the $4 million Frykholm owed. The United States questions whether the holder of a security interest given in exchange for an antecedent debt can be a bona fide purchaser for value but has not pursued the point—sensibly so. See Wis. Stat. §401.201(44)(b); see also *Swift v. Tyson*, 41 U.S. (16 Pet.) 1 (1842), overruled on other grounds by *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938). Its principal response is instead that Cotswold either had "cause to believe that the property was subject to forfeiture" or would have acquired such cause by conducting a reasonable investigation. The district court, however, granted summary judgment to Cotswold, ruling that although it likely knew that Frykholm was perpetrating a fraud, it did not know that the Property represented traceable proceeds of that fraud, and thus did not know that the Property "was subject to forfeiture". 2002 U.S. Dist. LEXIS 22040 (N.D. Ill. Nov. 12, 2002). As a result of the district court's decision,

Cotswold gets 200% of the amount it invested (making a tidy profit from Frykholm's scam), while the other victims' recovery will fall to 15%, as the Property represents about half of Frykholm's traceable assets.

On appeal the United States concentrates its energy on contending that §853(b)(6)(B) asks, not simply what a purchaser actually knows, but what it could have learned after investigation. It is hard to see in this statute an affirmative duty to inquire, but it may make sense to say that what Cotswold actually knew would have alerted any reasonable person to the possibility that real estate purchased by someone perpetrating a financial fraud, and unencumbered by any debt, represents funds skimmed from the venture. A person who has this much knowledge, and then averts his eyes lest he learn more, has actual knowledge via the ostrich inference often used in criminal prosecutions. See *United States v. Ramsey*, 785 F.2d 184 (7th Cir. 1986). A form of knowledge sufficient to support a conviction beyond a reasonable doubt under a statute requiring proof of scienter is more than sufficient to stave off summary judgment in civil litigation. It is hard to go beyond the ostrich inference in the direction of an investigation requirement; after all, the principal function of the bona-fide-purchaser doctrine is to protect buyers that did *not* investigate, and reading §853(n)(6)(B) to require investigation as a condition of being an innocent purchaser would all but vitiate the statute's goal of protecting persons who meet state-law definitions of bona fide purchasers for value. See *United States v. Lavin*, 942 F.2d 177, 186 (3d Cir. 1991).

The possibility that Cotswold knew enough to permit an ostrich inference—and thus could be found to have *actual* knowledge that Frykholm bought the Property with the proceeds of her fraudulent scheme—prevents summary judgment in Cotswold's favor. The state of Cotswold's knowledge is the subject of a material dispute. A remand for

trial is unnecessary, however, because the record shows that Cotswold does not satisfy one state-law element of bona-fide-purchaser status.

In November 1999, when Cotswold exchanged its investment for the promissory note and mortgage, Frykholm was insolvent. She owed more than $20 million to the investors (all of whom had been promised a doubling, or in Cotswold's case quadrupling, of their funds) yet had only $4 million in available assets. Her insolvency made the transaction a fraudulent conveyance. Section 548(a)(1)(B) of the Bankruptcy Code (11 U.S.C. §548(a)(1)(B)) provides a standard definition of a fraudulent conveyance: a transfer in which the debtor "(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation". That definition (which has a parallel in Wisconsin law, see Wis. Stat. §242.05) fits this situation exactly. See also *In re Loyal Cheese Co.*, 969 F.2d 515, 518-19 (7th Cir. 1992) (noting the similarity between §548(a)(1) and Wisconsin law). Frykholm was insolvent in November 1999 and did not receive reasonably equivalent value for the exchange; indeed she received no new value at all. Under the law of Wisconsin, a fraudulent conveyance transfers no rights; it prevents the transferee from achieving the status of a bona fide purchaser for value. See *Pippin v. Richards*, 146 Wis. 69 (1911); *Rindskopf v. Myers*, 87 Wis. 80 (1894).

Neither side paid much attention to the effect of the fraudulent conveyance, likely because both sides are represented by forfeiture specialists and have focused on the language of §853 and opinions interpreting that statute. Everything would have been clearer had the United States initiated an involuntary bankruptcy proceeding against Frykholm. That not only would have brought to the fore §548 of the Bankruptcy Code but also would have provided

a superior way to marshal Frykholm's remaining assets and distribute them to her creditors. Although §853(n)(1) allows the Attorney General to use forfeited assets for restitution, it does not create a comprehensive means of collecting and distributing assets. Bankruptcy would have made it pellucid that Cotswold cannot enjoy any priority over the other victims and cannot reap a profit while Frykholm's other creditors go begging. Moreover, bankruptcy would have enabled the trustee to recoup the sums distributed to the first generation of investors, who received $5 million or so against $2.5 million paid in. Those payments could have been reclaimed under the trustee's avoiding powers and made available to all of the bilked investors. It is too late to pursue the profits that Frykholm distributed to the first wave of investors in order to set up the later waves, but it is not too late to prevent the preferential distribution of any further assets to favored investors. Cotswold must stand in line with the rest.

REVERSED

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*