**UNITED STATES of America**

v.

**James F. O'CONNOR and James A. Geisler,**

**No. Crim.1:00 CR 285.**

United States District Court, E.D. Virginia, Alexandria Division.

June 15, 2004.

Robert Spencer, Dana Boente, U.S. Attorney's Office, Alexandria, for Plaintiffs or Petitioners.

Alan H. Yamamoto, Don Santarelli, Alexandria, for Defendants or Respondents.

## MEMORANDUM OPINION

ELLIS, District Judge.

This successful immigration fraud criminal prosecution resulted in forfeiture and restitution orders, as well as convictions. At bar now is the government's post-sentencing motion "to remit special assessments and direct restitution payments." This motion, although unopposed, raises several issues that merit brief discussion.

## I.

A brief summary of the facts and proceedings is useful to place the motion in context.[1] Following an eleven-day bench trial held on March 28 to April 18, 2001, defendants James F. O'Connor and James A. Geisler were found guilty of 48 counts charging them jointly with (i) conspiracy to commit immigration fraud, tax fraud and wire fraud, in violation of 18 U.S.C. § 371 (Count 1), (ii) immigration fraud, in violation of 18 U.S.C. § 1546(a) (Counts 2–25), (iii) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 26) and (iv) money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) (Counts 27–48). *See United States v. O'Connor and Geisler,* 158 F.Supp.2d 697 (E.D.Va.2001). In addition to these joint offenses, O'Connor was separately charged and found guilty of filing false income tax returns, in violation of 26 U.S.C. § 7206(1) (Counts 49–50), and failure to file income tax returns, in violation of 26 U.S.C.

§ 7203 (Counts 51–52). *See id.* Geisler, in turn, was separately charged and found guilty of filing false income tax returns, in violation of 26 U.S.C. § 7206(1) (Counts 53–55), and bankruptcy fraud, in violation of 18 U.S.C. § 152 (Counts 56–61). *See id.*

The trial record demonstrated that O'Connor and Geisler had jointly devised a scheme and plan to induce alien investors who wished to receive green cards pursuant to the EB–5 investment visa program,[2] but who did not possess the requisite $500,000 investment, to invest some lesser amount of money, typically between $100,000 and $150,000, in a purported EB–5 program sponsored by The InterBank Group, Inc., a company owned and operated by O'Connor and Geisler. In the course of the scheme, to make it appear to the Immigration and Naturalization Service (INS) that each alien had invested the requisite $500,000 in the EB–5 program, O'Connor and Geisler devised a sham Bahamian loan transaction to be used in connection with the EB–5 applications filed by InterBank on behalf of alien clients. In this regard, O'Connor and Geisler created and sent false documentary wire transfers to and from the Bahamas to make it appear that each alien had invested the requisite $500,000 amount.

In all, from 1996 to 2000, InterBank filed with the INS, under oath, approximately 335 false EB–5 applications on behalf of alien clients, each of which was prepared at the direction of O'Connor and Geisler. Each petition stated falsely that the particular alien client had invested $500,000 in a new commercial enterprise, as required by the EB–5 program, and that each investment had created, or would

---

**1.** For a more complete recitation of the facts of this case, see *United States v. O'Connor and Geisler,* 158 F.Supp.2d 697 (E.D.Va.2001).

**2.** Under the EB–5 program, enacted by Congress in 1990, aliens may obtain lawful per-

manent resident status in the United States if they invest $500,000 in a new commercial enterprise located in a rural or high-unemployment area of the United States and create at least ten new American jobs in the course of doing so. *See* 8 U.S.C. § 1153(b)(5).

create within two years, ten new American jobs. In fact, not a single alien client invested the requisite $500,000 in a new commercial enterprise. Each petition also failed to disclose that the bulk of the alien's alleged $500,000 investment was comprised of a sham Bahamian loan.

In the course of the scheme, InterBank collected approximately $21 million dollars from alien investors. Contrary to O'Connor's and Geisler's representations to the alien clients, these funds were not held by InterBank in escrow pending INS approval of the alien clients' EB–5 applications. Instead, shortly after InterBank received a particular alien client's funds, such funds were commingled with other funds controlled by O'Connor and Geisler and subsequently used by O'Connor and Geisler to fund the sham Bahamian loan transactions and other InterBank operations, and for personal uses. As a result, most of the alien clients suffered a total loss of the funds they entrusted to O'Connor and Geisler.

In addition to the fraudulent EB–5 investment scheme, the trial record also reflects that both O'Connor and Geisler had under-reported their income in various federal tax returns. The evidence also reflected that O'Connor had failed to file

timely federal income tax returns in 1995 and 1996 and that Geisler had made numerous false statements in connection with a Chapter 11 bankruptcy proceeding.

Based on this offense conduct, on January 11, 2002, O'Connor was sentenced to the custody of the Bureau of Prisons for a total of 124 months,[3] to be followed by three years of supervised release. He was also ordered to pay a special assessment of $5,050, pursuant to 18 U.S.C. § 3013(a). Geisler, in turn, was sentenced to a total of 112 months imprisonment,[4] to be followed by three years of supervised release. His special assessment totaled $5,700.[5]

Additionally, both O'Connor and Geisler were ordered jointly and severally to pay restitution to the numerous victims of their offenses in the total amount of $17,591,365.17, pursuant to the Mandatory Victims Restitution Act of 1996 (MVRA), 18 U.S.C. 3663A, which mandates restitution for particular crimes, including defendants' fraud and money laundering convictions. The Judgment and Commitment Orders also provided that in the event this total amount was not paid in full immediately, as occurred here, O'Connor and Geisler were to pay restitution, as a special condition of their terms of supervised release, at the rate of $500 per month, with

---

3. O'Connor's total custody sentence consists of the following individual sentences, each of which was ordered to run concurrently with the others: (i) 60 months on the conspiracy to commit immigration fraud, tax fraud and wire fraud conviction (Count 1); (ii) 120 months on each of the immigration fraud convictions (Counts 2–25); (iii) 124 months on the conspiracy to commit money laundering conviction (Count 26); (iv) 124 months on each of the money laundering convictions (Counts 27–48); (v) 36 months on each of the false income tax return convictions (Counts 49–50); and (vi) 6 months on each of the failure to file income tax return convictions (Counts 51–52).

4. Geisler's total custody sentence consists of the following individual sentences, each of

which was ordered to run concurrently with the others: (i) 60 months on the conspiracy to commit immigration fraud, tax fraud and wire fraud conviction (Count 1); (ii) 112 months on each of the immigration fraud convictions (Counts 2–25); (iii) 112 months on the conspiracy to commit money laundering conviction (Count 26); (iv) 112 months on each of the money laundering convictions (Counts 27–48); (v) 36 months on each of the false income tax return convictions (Counts 53–55); and (vi) 60 months on each of the bankruptcy fraud convictions (Counts 56–61).

5. Although O'Connor and Geisler initially appealed their convictions and sentences to the Court of Appeals for the Fourth Circuit, these appeals were subsequently dismissed voluntarily, pursuant to Rule 42, Fed. R.App. P.

payments to commence within 60 days after their release from imprisonment.

Defendants' Judgment and Commitment Orders directed restitution payments to be distributed pro rata to each of the victims. In this regard, attached to each Judgment and Commitment Order was a chart specifically identifying 216 victims by name, but not by their respective loss amounts. The chart also contained complete or partial mailing addresses for most, but not all of the 216 victims and many of these addresses were overseas. Although not reflected in the chart, it appears from additional information provided by the government and the Probation Office that more than 60 of the 216 victims suffered an undetermined loss amount, while the remaining victims suffered individual losses ranging from $2,485 to $499,985.[6]

It appears from the record, and the government agrees, that a portion of the victims' losses can be recouped with the use of the proceeds from items and amounts defendants were ordered to for-

feit to the government. In this regard, by Order of Forfeiture dated January 17, 2002, O'Connor and Geisler were ordered to forfeit $17,868,250 to the United States of America as illegal proceeds of their criminal activity, pursuant to 18 U.S.C. §§ 982(a)(1), 982(a)(6)(A) and (B) (incorporating the provisions of 21 U.S.C. § 853).[7] *See United States v. O'Connor and Geisler*, Criminal No. 1:00cr285 (E.D.Va. Jan. 17, 2002) (Order of Forfeiture). And, to satisfy a portion of this forfeiture order, O'Connor and Geisler were further directed, pursuant to 18 U.S.C. §§ 982(a)(1), 982(a)(6)(A) and (B) and Rule 32.2(b), Fed. R.Crim.P., to forfeit to the government any interest they had in certain specifically described property, including, *inter alia*, several residences, bank accounts, motor vehicles and jewelry items, and the Attorney General or the Secretary of the Treasury was authorized to seize such property.[8] *See United States v. O'Connor and Geisler*, Criminal No. 1:00cr285 (E.D.Va. Jan. 17, 2002) (Order of Forfeiture). Following additional proceedings pursuant to 21 U.S.C. § 853(n),[9] the property ultimate-

---

**6.** Attached to the Sentencing Memoranda entered in this case is a chart listing each victim by name, but not address, and identifying his or her individual loss amount, determined as of the date of sentencing. *See United States v. O'Connor*, Criminal No. 1:00cr285 (E.D.Va. Jan. 11, 2002) (Sentencing Memorandum); *United States v. Geisler*, Criminal No. 1:00cr285 (E.D.Va. Jan. 11, 2002) (Sentencing Memorandum). Subsequent investigation by the government and the Probation Office revealed several additional loss amounts not included in the original calculations. Thus, the Probation Office has prepared an updated chart listing all of the victims by name, address and any determined individual loss amount.

**7.** Specifically, the indictment sought forfeiture of all property involved in or traceable to the money laundering offenses charged in Counts 26–48, pursuant to 18 U.S.C. § 982(a)(1), and all property derived from or traceable to the proceeds obtained from or intended to facilitate the immigration fraud

offenses charged in Counts 1–25, pursuant to 18 U.S.C. § 982(a)(6).

**8.** Pursuant to 18 U.S.C. § 982(b)(1)(A), incorporating the provisions of 21 U.S.C. § 853(c), all right, title and interest in property (i) derived from or used to facilitate the immigration fraud offenses and (ii) involved in or traceable to the money laundering offenses vested in the United States upon commission of the acts giving rise to forfeiture. Indeed, property forfeited in a criminal case belongs solely to the United States, subject to the claims of (i) bona fide purchasers for value without reason to know of the forfeitability of the property at the time of their purchase, and (ii) third parties who had a vested right, title or interest in the property superior to that of the defendant. *See* 21 U.S.C. § 853(n)(6)(A).

**9.** The January 17, 2002 Forfeiture Order provided that any person, other than the defendants, asserting any legal interest in the for-

ly forfeited to the United States, and seized by the Secretary of the Treasury,[10] was as follows:

1. 1992 BMW 525I, with a net value of $1,031.60;

2. Real property located at 7416 Union Ridge Road, Clifton, Virginia, with a net value of $10,438.29;

3. $11,074.63 in proceeds generated from the trustee's sale of the real property located at 6310 Beverlys Mill Road, Broad Run, Virginia;

4. Bank of America account 9100007075532 in the name of Adele D. Geisler, POD James A. Geisler, with a net value of $1,083.67;

5. Bank of America account 91000019868239 in the name of Adele D. Geisler, POD James A. Geisler, with a net value of $99,106.76; and

6. Jewelry consigned to The Nugget in Alexandria, Virginia, by James F. O'Connor, with a net value of $964.21.

To date, $123,699.16 in forfeiture proceeds have been remitted by the Secretary of the Treasury to the Clerk's Office in this case. O'Connor has sent an additional $300 to the Clerk's Office, pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program, and Geisler has sent an additional $50. Accordingly, a total of $124,049.16 has thus far been received by the Clerk's Office in connection with this case. Of this amount, it appears that the Clerk's Office credited approximately $900 of the funds received from the Secretary of the Treasury toward the defendants' special assessment obligations.[11]

feited property could, within thirty days of the final publication of notice or his or her receipt of notice, petition the Court pursuant to 21 U.S.C. § 853(n) for a hearing to adjudicate the validity of his or her alleged interest in the property. *See United States v. O'Connor and Geisler*, Criminal No. 1:00cr285 (E.D.Va. Jan. 17, 2002) (Order of Forfeiture). Three such petitions were eventually filed and ruled on in this case—one by Federal Home Loan Mortgage Corporation, one by Adele Geisler, and the third by Ann O'Connor. *See United States v. O'Connor and Geisler*, Criminal No. 1:00cr285 (E.D.Va. Apr. 18, 2002) (Order) (granting the § 853(n) petition filed by Federal Home Loan Mortgage Corporation); *United States v. O'Connor, Geisler*, Criminal No. 1:00cr285 (E.D.Va. Jan. 9, 2003) (Order) (granting in part and denying in part the § 853(n) petitions filed by Adele Geisler and Ann O'Connor).

10. In its initial motion and memorandum requesting the issuance of an order of forfeiture, filed on November 1, 2001, the government stated that any order of forfeiture "shall authorize the Attorney General to seize the interest or property subject to forfeiture," in accordance with Rule 32.2, Fed.R.Crim.P., which provides, in pertinent part, that "[t]he entry of a preliminary order of forfeiture authorizes the Attorney General (or a designee) to seize the specific property subject to forfei-

ture...." The government's supplemental motion and memorandum regarding forfeiture, filed on December 4, 2001, contained a similar statement authorizing seizure of the forfeited property.

11. This credit appears to have occurred as a result of confusion concerning certain language contained in the final forfeiture orders providing, *inter alia*, that "90% percent of the remaining proceeds shall be remitted to the Clerk of Court as restitution...." *See, e.g., United States v. O'Connor and Geisler*, Criminal No. 1:00cr285 (E.D.Va. Aug. 18, 2002) (Final Decree of Forfeiture (1992 BMW 525I and 1999 Honda CR–V)). Although the government represents that this language was intended to authorize the Secretary of the Treasury to retain 10% of the value of the forfeited property to cover the expenses of forfeiture, including the costs of seizure, advertising and sale of the property, it was apparently interpreted by the Clerk's Office and the Secretary of the Treasury to mean that all of the forfeited funds would be remitted by the Secretary of the Treasury to the Clerk's Office and that, of this total amount, 90% would be applied toward defendants' restitution obligations and the remaining 10% would be applied toward their special assessment obligations. Thus, it appears from the record that 100% of the value of the forfeited property ($123,699.16) was remitted to the

Now at issue is the government's motion "to remit special assessments and direct restitution payments." Specifically, the government requests that the significant special assessments imposed on the defendants at sentencing be set aside and that the Clerk's Office be directed to reapply any amount previously credited toward the defendants' special assessment obligations to their restitution obligations. The government further requests that the Clerk's Office be directed to disburse the $123,699.16 in forfeiture proceeds received from the Secretary of the Treasury, and the additional $350.00 received from the defendants, as partial restitution to the victims of the offenses. And, in this regard, the government proposes a distribution scheme other than pro rata, as originally ordered in defendants' Judgment and Commitment Orders. Each of the government's requests is separately addressed.

## II.

The government's first request is easily resolved. Specifically, the government requests that the special assessments imposed on the defendants in this case under 18 U.S.C. § 3013—$5,050 for O'Connor and $5,700 for Geisler—be remitted, or set aside, pursuant to 18 U.S.C. § 3573. That section provides, in part, that "[u]pon petition of the Government showing that reasonable efforts to collect a fine or assessment are not likely to be effective, the court may, in the interest of justice...remit all or part of the unpaid portion of the fine or special assessment, including interest and penalties...." 18 U.S.C. § 3573; *see also United States v. Merric,* 166 F.3d

406 (1st Cir.1999) (recognizing that § 3573 "permit[s] the government to move to remit unpaid portions of a fine or a special assessment where 'reasonable efforts to collect...are not likely to be effective'").

■ Here, the record reflects, and the government concedes, that the defendants possess insufficient assets to satisfy both the special assessment obligations and the forfeiture and restitution obligations imposed in this case. Indeed, because reasonable efforts to collect the special assessments from the defendants are not likely to be effective, and because crediting any additional funds received from the defendants toward their special assessment obligations would not serve to benefit the victims of the offense in any respect, the special assessments imposed on O'Connor and Geisler are properly remitted "in the interest of justice," pursuant to 18 U.S.C. § 3573.[12] This result will ensure that any and all sums received by the Clerk's Office from the defendants, through the Bureau of Prisons Inmate Financial Responsibility Program or otherwise, will be available for distribution as partial restitution to the victims of defendants' offenses.[13]

## III.

Resolution of the government's second request—namely, that the $123,699.16 in forfeiture proceeds remitted to the Clerk's Office by the Secretary of the Treasury be used to make partial restitution payments to the victims of the offenses—requires more discussion.

Clerk's Office by the Secretary of the Treasury in this instance, not merely 90% as initially contemplated by the government.

**12.** This includes the approximately $900 in forfeiture proceeds credited by the Clerk's Office toward defendants' special assessment obligations.

**13.** This result finds further support in 18 U.S.C. § 3572(b), which provides that if "the defendant has the obligation to make restitution to a victim of the offense...the court shall impose a fine or other monetary penalty only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution." 18 U.S.C. § 3572(b).

Pursuant to the federal forfeiture statute, 18 U.S.C. § 982(a)(1), and the MVRA, 18 U.S.C. § 3663A(a)(1), both forfeiture and full restitution were required in this case and were thus properly imposed. And, it is important to note that forfeiture and restitution are not mutually exclusive; rather, they each serve separate and distinct goals. Specifically, forfeiture generally serves to remove from an offender the fruits and instrumentalities of his crime, and thereby provides a powerful disincentive to commit the crime in the first instance.[14] An order of restitution, on the other hand, serves primarily to compensate victims for any losses suffered as a result of a defendant's criminal activity.[15]

Because forfeiture and restitution serve distinct goals, a defendant generally has no right or entitlement to use forfeited funds to satisfy an additional restitution obligation. Put another way, amounts that are forfeited by a defendant to the United States are not typically available to pay whatever criminal monetary penalties are imposed upon that defendant. *See United States v. Alalade*, 204 F.3d 536, 540–41 (4th Cir.2000). This is so, in part, because rightful ownership of forfeited funds vests in the United States at the moment the triggering forfeiture act occurs. *See supra* n. 8; 21 U.S.C. § 853(c); *United States v. Emerson*, 128 F.3d 557, 567 (7th Cir.1997) (noting that "once the Government wins a judgment of forfeiture, the relation-back doctrine provides that the right, title, and interest in the forfeited property vests in the United States at the time the defendant committed the offense that gives rise to the forfeiture") (citations omitted).

Despite these general principles, it is clear that the government may, in appropriate circumstances, agree to restore or assign forfeited proceeds to the victims of the underlying criminal conduct.[16] The government has done precisely this in the instant case, by authorizing the Secretary of the Treasury to remit the forfeiture proceeds to the Clerk's Office to be applied

---

**14.** *See, e.g., United States v. Johnston*, 199 F.3d 1015 (9th Cir.1999) (noting that "forfeiture is mandatory and designed to ensure that a defendant does not profit from his crimes"); *United States v. Emerson*, 128 F.3d 557 (7th Cir.1997) (noting that "[f]orfeiture...seeks to punish a defendant for his ill-gotten gains"); *United States v. Weinberger*, 91 F.3d 642, 644 (4th Cir.1996) (recognizing that "forfeiture actions signify that a defendant possessed contraband or property derived from (or used to facilitate) unlawful activity") (citation omitted).

**15.** *See, e.g., United States v. Simmonds*, 235 F.3d 826, 831 (3d Cir.2000) (noting that the purpose of the MVRA is "to the extent possible, to make victims whole, to fully compensate victims for their losses, and to restore victims to their original state of well-being"); *United States v. Johnston*, 199 F.3d 1015 (9th Cir.1999) (noting that restitution is "designed to compensate victims for their loss"); *United States v. Various Computers and Computer Equipment*, 82 F.3d 582 (3d Cir.) (recognizing that "[r]estitution operates to make the victim of the crime whole"), *cert. denied*, 519 U.S. 973, 117 S.Ct. 406, 136 L.Ed.2d 320 (1996).

**16.** *See* 18 U.S.C. § 981(e)(6) (providing that the Attorney General, the Secretary of the Treasury or the Postal Service may retain forfeited property or transfer such property on such terms and conditions as he may determine "as restoration to any victim of the offense giving rise to the forfeiture, including, in the case of a money laundering offense, any offense constituting the underlying specified unlawful activity"); 21 U.S.C. § 853(i)(1) (stating that the Attorney General may "grant petitions for mitigation or remission of forfeiture, restore forfeited property to victims...or take any other action to protect the rights of innocent persons which is in the interest of justice...."); *see also United States v. Frykholm*, 362 F.3d 413 (7th Cir.2004) (where the government planned to use forfeited assets to make restitution to the victims of the offense, pursuant to 21 U.S.C. 853(n)(1), which would be sufficient to return approximately 30% of the victims' losses).

toward the defendants' restitution obligation. Indeed, the government has consistently taken the position throughout these proceedings that a portion of the total amount of restitution should be satisfied through use of the forfeiture proceeds.[17]

■ Although use of the forfeiture proceeds as partial satisfaction of the restitution order effectively grants defendants a substantial benefit to which they otherwise would not be entitled, the result in this case is properly viewed, as the government contends, not as one in favor of the defendants, but rather, as one in favor of the victims of defendants' criminal activity.[18] Thus, given the significant losses suffered by the victims of defendants' offenses, and because the government has a significant interest in the defendants' satisfaction—or at least partial satisfaction—of their restitution obligation under the MVRA, the forfeiture proceeds remitted by the Secretary of the Treasury in this case pursuant to 18 U.S.C. § 981(e)(6), see supra n. 16, are appropriately ordered to be applied by the Clerk's Office to satisfy a portion of defendants' restitution obligation, as the government requests.

### IV.

The government's third request concerns the manner in which all current and future restitution payments are to be distributed among the numerous victims of defendants' offenses. It is clear that restitution awards under the MVRA, as involved here, must be implemented and enforced according to the provisions of 18 U.S.C. § 3664. See 18 U.S.C. § 3663A(d) (providing that an order of restitution under 18 U.S.C. § 3663A "shall be issued and enforced in accordance with section 3664"). Section 3664, in turn, requires district courts to "order restitution to each victim in the full amount of each victim's losses as determined by the court...." 18 U.S.C. § 3664(f)(1)(A).[19] Given the clear mandate of the MVRA, O'Connor and Geisler were ordered in this case to pay, jointly and severally, a total of $17,591,365.17 in restitution to the numerous victims of their offenses, this amount being based on specific loss information provided to the government and the Probation Office by the alien investors as of the time of sentencing.

After determining the correct amount of restitution to be imposed, district courts must then determine the manner and schedule for the payment of restitution. See 18 U.S.C. § 3664(f)(2); United States v. Alalade, 204 F.3d 536, 539 (4th Cir.2000) (stating that "after determining the full amount of restitution owed to each victim, the district court is required to set the manner in which, and the schedule accord-

17. For example, in a pleading concerning restitution dated January 4, 2002, the government acknowledged that "[a] portion of the restitution may be satisfied by the forfeiture."

18. Cf. Lavin v. United States, 299 F.3d 123, 127 (2d Cir.2002) (holding that the district court properly applied a Rule 41(e) movant's seized money toward the satisfaction of his restitution order rather than return the money to the movant, even though the government had not filed forfeiture proceedings on the property because the government "had a legitimate interest in ensuring that the valid restitution order...was satisfied"); United States v. Mills, 991 F.2d 609, 612 (9th Cir.

1993) (holding that "a valid restitution order...gives the government a sufficient cognizable claim of ownership to defeat a defendant's Rule 41(e) motion for return of property, if that property is needed to satisfy the terms of the restitution order").

19. In this regard, in determining the full amount of restitution, district courts are precluded from considering either "the economic circumstances of the defendant" or "the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source...." 18 U.S.C. § 3664(f)(1)(A)-(B).

ing to which, the defendant is to pay the amount of restitution ordered"). This is typically done with reference to, and upon consideration of, (i) the financial resources and other assets of each defendant, including whether any of the assets are jointly controlled, (ii) the projected earnings and other income of each defendant and (iii) any financial obligations of each defendant, including any obligations to dependents. *See* 18 U.S.C. § 3664(f)(2)(A)-(C); *Alalade,* 204 F.3d at 539 (citing 18 U.S.C. § 3664(f)(2)).

As noted above, the Judgment and Commitment Orders entered in this case directed that restitution payments be distributed pro rata, or proportionately, to each of the 216 identified victims. Yet, because neither the Judgment and Commitment Orders nor the Presentence Investigation Reports prepared by the Probation Office contains a complete listing of all of the affected victims, together with their individual loss amounts and correct mailing addresses,[20] it appears that the Clerk's Office will be unable to distribute any restitution payments absent further judicial direction.[21]

In these circumstances, it is appropriate to treat the deficiencies in the Judgment and Commitment Orders regarding the manner and schedule by which restitution is to be paid to the victims of the offenses as a clerical error under Rule 36, Fed. R.Crim.P. That Rule provides that "[a]fter giving any notice it considers appropriate, the court may at any time correct a clerical error in a judgment, order, or other part of the record, or correct an error in the record arising from oversight or omission." Rule 36, Fed.R.Crim.P. Indeed, an amended restitution order correcting this clerical error and providing specific distribution instructions would enable the Clerk's Office to disburse restitution payments to the victims of the offenses in accordance with the applicable federal statutes.

 Initially, for the more than 60 victims with an undetermined loss amount, it is proper, as the government suggests, to assign those victims a nominal loss amount of $500.[22] Each of the 216 identified victims would then be entitled to receive an initial per capita, or equal share, payment of $500.[23] And then, if each of

**20.** As previously noted, the Judgment and Commitment Orders entered in this case included a chart specifically identifying 216 victims by name, but not by their respective loss amounts, and complete or partial mailing addresses were provided for most, but not all, of the victims. Both Sentencing Memoranda, on the other hand, included a chart identifying the victims by name and by the individual loss amounts determined as of the sentencing date.

**21.** Pursuant to 18 U.S.C. §§ 3611 and 3612, it is the Clerk's Office that distributes restitution payments to the victims named in the judgment and commitment order. But, because the Clerk's Office functions in this regard in a purely ministerial role, it cannot legally distribute any restitution payments to any of the victims of the offense without clear judicial instructions. *See* 28 U.S.C. § 2402 (stating that "[n]o money deposited under section

2041 of this title shall be withdrawn except by order of the court").

**22.** Although this would essentially add an additional $34,500 to the victims' individual loss amounts, the total amount of restitution ordered—$17,591,365.17—would still remain unchanged. In any event, this additional $34,500 in the individual loss calculations will likely never be a genuine issue, as it is a virtual certainty that the defendants will never even come close to satisfying their entire restitution obligation.

**23.** It is clear that district courts have the authority to direct that restitution payments be made to the victims of an offense in a manner other than pro rata. Indeed, 18 U.S.C. § 3664(i) provides, in pertinent part, that

[i]f the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a

the identified 216 victims were to receive and cash a $500 restitution check, the Clerk's Office's deposit account would be reduced by a total of $108,000, leaving over $16,000 in funds remaining for restitution disbursement. It is more likely, however, that many of the $500 restitution checks will never reach and be cashed by the designated victims, owing chiefly to the absence of correct addresses. For this reason, it is proper to place a shelf life of six months on the $500 restitution checks. Thus, after six months, any uncashed $500 checks would be cancelled and rendered null and void, allowing the Clerk's Office to have additional sums certain for distribution to the remaining victims.

As for the funds remaining in the deposit account after six months, it is proper to direct the Clerk's Office to disburse these funds to the victims who actually cashed their initial $500 restitution check and who suffered more than a nominal $500 loss.[24] In this regard, these remaining funds should be distributed to the victims pro rata, or proportionately to their respective loss amounts, as originally ordered in the Judgment and Commitment Orders, ultimately depleting all of the funds now available for distribution. Any future funds thereafter received by the Clerk's Office from the defendants in satisfaction of their restitution obligations should also be distributed to the remaining victims of the offenses, but only in $500 increments, with the first $500 in this third round of payments to be sent to the victim suffering the highest loss amount. Future restitution payments shall then continue to be disbursed by the Clerk's Office in this manner, in $500 increments,[25] until the victim suffering the smallest loss amount has received a payment, at which time the procedure would begin again with the victim suffering the highest loss amount.

The resolution reached here strikes a balance between fairness and practicality. Indeed, an initial per capita payment of $500 to each of the victims of the offense will ensure that each victim is recognized and compensated, at least to some extent, for the significant losses suffered as a result of the defendants' criminal conduct. Moreover, subsequent pro rata payments to the victims—with any funds remaining in the Clerk's Office's deposit account six months after the first-round $500 checks are issued, and also with any additional funds received from the defendants in the future—acknowledges the significant differences in the victims' individual loss amounts.

An appropriate Order will issue.

different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim.
18 U.S.C. § 3664(i).

**24.** In other words, those victims who were only assigned a $500 nominal loss would not be entitled to receive any additional restitution funds.

**25.** Obviously, in the event the remaining amount of restitution owed to a particular victim is less than $500, only that remaining amount shall be disbursed to that victim, at which point he or she will be fully compensated for his or her loss.